IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

---

# CASE NO.  22-13327-HH

---

**Jeffrey Horn**,
Appellant/Defendant

vs.

**United States**,
Appellee/Plaintiff

---

On Appeal from the United States District Court
for the Southern District of Florida
Case no. 21-CR-60019-RS

---

**INITIAL BRIEF OF APPELLANT HORN**
_____

MICHAEL HURSEY, Esq.
Counsel for Appellant Horn
5220 S. University Dr., C-110
Ft.  Lauderdale, FL 33328
Tel:(954) 252-7458
Fax:(754) 551-6574
FL Bar No. 457698
Email: mhpalaw@bellsouth.net

CRIMINAL APPEAL

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

Case no. 22-13327-HH

UNITED STATES OF AMERICA
     Appellee,

vs.

JEFFERY HORN,
     Appellant.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
_____

**APPELLANT HORN'S**
**NOTICE CONCERNING**
**CERTIFICATE OF INTERESTED PERSONS**
**AND CORPORATE DISCLOSURE STATEMENT**

MICHAEL HURSEY, Esq.
Counsel for Appellant Horn
5220 S. University Dr., C-110
Ft. Lauderdale, FL 33328
Tel:(954) 252-7458
Fax: (754) 551-6574
Fla. Bar No. 457698
Email:mhpalaw@bellsouth.net

## **Appellant Horn's Certificate of Interested Persons**
## **and Corporate Disclosure Statement**

Under 11th Cir. R. 26.1-1, Appellant Horn files his *Certificate of Interested Persons and Corporate Disclosure Statement*. The following is a complete list of all persons and entities Appellant believes to have an interest in the outcome of the case:

Allen, Myrna

Allen, J. Timothy

Balistreri, Rosemary B.

Banks, Thomas R.

Barlow Corrine J.

Bartley, Donnie Gene

Bauschka, John Bernard, L.

Betros, Jeffrey

Carteaux, Daniel M.

Caruso, Michael

Chance, Richard F.

Clayman, Eric H.

Appellant Horn's *Notice Concerning Certificate of Interested Persons*
and *Corporate Disclosure Statement* (Cont'd)

Costrino, Robert M.

D.C.

Delaparte, Cynthia

Eisner, Detlef

Elite Electrical Supply Inc.

E.P.

Fenn, Leonard Paul

Floyd, Timothy E.

FSJ Oiltech (Sean Augey)

Fusell, Rebecca

Gonzalez, Juan Antonio

Goodman, Dianna

Gray, David F.

Grunsyen, Edward

G.T.K. Electric Controls (Geoff Knapp)

Havas, Irene

Havas, Nick

Appellant Horn's *Notice Concerning Certificate of Interested Persons*
and *Corporate Disclosure Statement* (Cont'd)

Horn, Arnold

Horn, Jeffrey Alan

Hursey, Ralph Michael

Huykman, Cheryl

Huykman, Richard B.

Johnson, Ernest E.

Johnson, Muriel P.

Jollensten, Steve

Kimbro, Pamela A.

Kimbro, Sammy

Legatt, Conrad S.

Legatt, Kathryn

Lenis, Dimitrios C.

Lopez, Omar Antonio

Malone, Todd Omar

Martin, Debra S.

McKay, Donald Bruce

Appellant Horn's *Notice Concerning Certificate of Interested Persons*
and *Corporate Disclosure Statement* (Cont'd)

Mlynarski, Joel D.

Neseson, James T.

Nicol, Matt

Nye, James William

Olerud, Kevin

Olund, David

Owen, Kenneth D.

Plummer, Omar Leon

Powell, Sheldon K.

Richardson, David L.

Ritt, Daniel O.

Roman, John J.

Rubio, Lisa Tobin

Sabol, John

S.J.

Silverstein, Joan

Sobel, David J.

Appellant Horn's *Notice Concerning Certificate of Interested Persons*
and *Corporate Disclosure Statement* (Cont'd)

Smith, Hon. Rodney

Snider, David A.

Snow, Hon. Lurana S.

Spivey, Patrick

Stone, Emily Rose

Straughter, McArthur

Strong, Nicholas

Sullivan, III, Benjamin F.

S.W.

System Clg

Torres, Hon. Edwin G.

Urbano, Dennis Nicholas

Valle, Hon. Alicia O.

Watson, John Bert

Williams, Dwayne Edward

Wilson, Paul E.

Wuchner, Warren

Appellant Horn's *Notice Concerning Certificate of Interested Persons*
and *Corporate Disclosure Statement* (Cont'd)

Respectfully submitted,

 s/Michael Hursey_____
MICHAEL HURSEY, Esq.
Counsel for Appellant HORN
5220 S. University Dr., C-110
Ft. Lauderdale, FL 33328
Telephone:(954) 252-7458
Fax:   (754) 551-6574
Fla. Bar No. 457698
Email: mhpalaw@bellsouth.net

**<u>CERTIFICATE OF SERVICE</u>**

   **I HEREBY CERTIFY** the foregoing has been furnished via CM/ECF this 20th day of  September, 2023.

s/Michael Hursey_____
MICHAEL HURSEY, P.A.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Horn respectfully requests oral argument, because it will help this Court determine the salient facts and relevant law necessary to decide this complex stock fraud appeal.

# TABLE OF CONTENTS

**Page**

STATEMENT OF INTERESTED PERSONS and
CORPORATE DISCLOSURE STATEMENT ......................................... C-2

STATEMENT REGARDING ORAL ARGUMENT .................................... i

TABLE OF CONTENTS.................................................................. ii

TABLE OF CITATIONS ............................................................. viii

EXPLANATION OF SYMBOLS .................................................... xiii

CERTIFICATE OF COMPLIANCE............................................... xiv

STATEMENT OF JURISDICTION............................................... xv

STATEMENT OF THE ISSUES.................................................... 1

COURSE OF PROCEEDINGS AND DISPOSITION BELOW ................... 2

   A.  Statement of the Case ........................................................ 2

   B.  Statement of the Facts ....................................................... 4

SUMMARY OF THE ARGUMENT and
STANDARD OF REVIEW ........................................................... 7

**ARGUMENT I:**

**The evidence was insufficient to show Appellant Horn acted "willfully" and had the requisite criminal intent to defraud investors** ............................................................ 16

**A.**  Horn invited his father to buy Sunset stocks ........................ 17

**B.**  Horn was duped by Watson, Sr., Watson, Jr. and Sunset  executives and was a "victim" like investors ........... 17

     i.  Watson, Jr., showed Horn Sunset corporate assets and convinced him Sunset was legitimate .......... 17

     ii.  Horn only repeated what he had been shown and told by Watson, Jr. ........................................................ 17

     iii.  Expert testified Sunset artifacts and gems listed as assets had value ....................................................... 17

     iv.  Horn was only an administrative assistant and did not create the Personal Placement Memorandum ("PPM"), Subscription Agreement, or A Must Read for Sunset Investors ....................................................................... 18

**C.**  Horn believed Sunset's PPM and gem and artifacts appraisal .............................................................................. 18

**D.**  Independent stock transfer agent for Sunset and Sunset corporate executives all testified they saw no fraud at Sunset .................................................................... 21

**E.**  Investors "got what they paid for" ........................................ 23

**ARGUMENT II:**

**The court below erred when it made the finding Appellant Horn was an "organizer" or "leader"** ............................................ 24


**ARGUMENT III:**

**The court below erred at sentencing when it made the finding the "intended loss" amount was $3,750,000 and gave Horn an 18-level enhancement** ............................................... 30

   **A.** This Court's *Stein* decision is instructive ............................... 33

   **B.** Sunset stock had value .......................................................... 43

   **C.** Virtually none of the investors ever tried to go through the process to get their Sunset stock "unrestricted" or sell it ............................................ 44

   **D.** One Sunset investor (Horn's dad) got his Sunset stock "unrestricted", sold it, and made a $30k profit on his $50k stock purchase ................................................. 44

   **E.** Because Sunset stock had value, the "loss" amount is not simply a matter of multiplying funds paid by investors by number of stocks bought .................................. 45

   **F.** "Intended loss" amount is not reasonably foreseeable to Horn, so he should not be held responsible for it ............... 46

     i. Horn was duped by Watson, Jr., into believing Sunset was a legitimate business ...................................... 46

     ii. Horn left Sunset on Nov. 16, 2015, so subsequent "loss" should not be attributed to him .............................. 46

   **G.** Any purchase of stock has risks involved, so "no profit" does not equal fraud .................................................. 46

**H.** Horn was only given $182k total (out of which he was directed to pay employees); only $25k went to Horn personally ................................................................ 47

**ARGUMENT IV**
**The court below erred  at the restitution hearing when it made the finding the restitution amount was $1,469,702** ............. 47

**ARGUMENT V**
**The court below erred when it made the finding Horn was an (i) "officer" or (ii) "director" of a publicly-traded company, (iii) "broker" or person associated with a broker or dealer, or (iv) "investment advisor" or person associated with an investment advisor** .......................................... 50

**ARGUMENT VI**
**The court below erred when it made the finding of "10 or more victims"** ........................................................ 51

**ARGUMENT VII**
**Cumulative error by the court below and government denied Horn his constitutional due process right to a fair trial** ................................................................................... 52

**A.** The court below erred when it did not allow counsel for Horn to argue the affirmative defense of a violation of the Statute of Limitations ("SOL") ......................................... 52

    i.  The facts in the record supported an SOL defense ........... 52

ii. The court below abused its discretion by not stopping trial, fashioning an SOL jury instruction, instructing the jury on the elements of an SOL absolute defense, and permitting Horn's attorney to argue it ........................................................... 53

**B.** Horn's 5th Amendment right not to incriminate himself was violated by FBI Agent Palomares' testimony "I tried to get an in-person interview with Horn but was unsuccessful" ........................................................... 54

  i. Creates inference Horn avoided interview ....................... 55

  ii. Gives false impression of "consciousness of guilt" .......... 55

  iii. Horn is prejudiced because he had no legal recourse to correct this perception of "consciousness of guilt" .................................................. 56

**C.** Horn's Fifth Amendment right not to testify was prejudiced by FBI Agent Palomares' testimony regarding Horn avoiding an interview, an indirect comment on Horn's failure to testify at trial ........................... 56

  i. Horn not testifying, plus "not giving interview", *highlights* Horn's exercising his right not to testify at trial ..................................................... 56

  ii. This combination violates his 5th Amendment right against self-incrimination at an interview, and right to not testify ...................................... 56

**D**. The court below erred by allowing evidence that Horn did not file a tax return(s) during the alleged conspiracy ............................................................ 57

    i.   This evidence is not relevant.......................................... 57

    ii.   Horn's failure to file his personal tax return is more prejudicial than probative ..................................... 57

    iii.   Many legitimate reasons a tax return might not be filed............................................................................. 58

**E.**   The court below erred by letting a government witness testify as an "expert" without the government previously giving notice to defendants ................................. 58

    i.   Horn was prejudiced because he could neither prepare for an "expert witness" nor obtain a defense expert to counter the government expert ............................................................................. 59

CONCLUSION ............................................................................ 60

CERTIFICATE OF SERVICE ..................................................... 60

# TABLE OF CITATIONS

**Cases**                                                                                    **Page**

*Kisor v. Wilkie*,
   139 S. Ct. 2400 (2019) ................................................................. 30-31

*Montejo v. Louisiana*,
   556 U.S. 778, 795 (2009)..................................................................54

*Old Chief v. United States*,
   519 U.S. 172, 191 (1997)..................................................................57

*Stinson v. United States*,
   508 U.S. 36 (1993).........................................................................31

*Tello v. Dean Witter Reynolds, Inc.*,
   410 F.3d 1275, 1278 (11th Cir. 2005) ............................................15

*United States v. Abovyan*,
   988 F.3d 1288, 1312 (11th Cir. 2021) ....................................... 47, 49

*United States v. Alred*,
   144 F. 3d 1405, 1421-22 (11th Cir. 1998). .....................................27

*United States v. Baker*,
   432 F.3d 1189, 1203, 1223 (11th Cir. 2005) ..................................16

*United States v. Ballesteros-Garcia*,
   No. 16-11741, 2023 U.S. App. LEXIS 5743, at *8
   (11th Cir. Mar. 10, 2023) ........................................................ 48, 49

*United States v. Banks*,
   55 F.4th 246, 257 (3d Cir. 2022) ...................................................32

*United States v. Beasley*,
   2 F.3d 1551, 1562-63 (11th Cir. 1993), .........................................28

viii

**Cases**                                                   **Page**

*United States v. Cabrera*,
   172 F.3d 1287, 1292 (11th Cir. 1999) ........................................................... 12, 13

*United States v. Campa,*
   529 F.3d 980, 1013 (11th Cir. 2008) ...................................................................26

*United States v. Campbell*,
   765 F.3d 1291, 1302 (11th Cir. 2014) ......................................................... 12, 45

*United States v. Chalker*,
   966 F.3d 1177, 1192 (11th Cir. 2020) ......................................................... 22, 59

*United States v. Clar*ke,
   312 F.3d 1343, 1345 n.1 (11th Cir. 2002) ........................................................15

*United States v. Corker*,
   No. 22-10192, 2023 U.S. App. LEXIS 2863,
   at *9 (11th Cir. Feb. 6, 2023)…………………………………………………...31

*United States v. Dupree*,
   57 F.4th 1269 (11th Cir. 2023) (en banc) ................................................... 30-32

*United States v. Foster*,
   878 F.3d 1297, 1306 (11th Cir. 2018) ................................................................45

*United States v. Glinton*,
   154 F.3d 1245, 1260 (11th Cir. 1998) ................................................................28

*United States v. Gonzalez*,
   611 F. App'x 619, 630 (11th Cir. 2015) ........................................................ 41,42

*United States v. Henderson*,
   409 F.3d 1293, 1299 (11th Cir. 2005) ................................................................55

*United States v. Hipps*,
   857 Fed. Appx. 1002, 2021 WL 2026666 (11th Cir. 2021) ........................ 55, 56

**Cases**                                                                **Page**

*United States v. Holland*,
   223 F. App'x 891, 892, 895 (11th Cir. 2007)................................... 16, 59

*United States v. Hunter*,
   323 F.3d 1314, 1319 (11th Cir. 2003) ................................................40

*United States v. Jennings*,
   599 F.3d 1241, 1253 (11th Cir. 2010) ......................................... 25-26

*United States v. Joseph,*
   709 F.3d 1082, 1093 (11th Cir. 2013) ..............................................15

*United States v. Kennert*,
   No. 22-1998, 2023 WL 4977456, at *4 (6th Cir. Aug. 3, 2023) ........................32

*United States v.Lamont Johnson*,
   64 F.4th 1348, 1352 (D.C. Cir. 2023)........................................... 28-30

*United States v. Lozano-Hernandez*,
   89 F.3d 785, 790 (11th Cir. 1996) ...................................................28

*United States v. Martinez,*
   584 F.3d 1022, 1028-29  (11th Cir. 2009)..................................... 25-27

*United States v. Mateos,*
   623 F.3d 1350, 1370 (11th Cir. 2010) ..............................................40

*United States v. McCrimmon*,
   362 F.3d 725, 731 (11th Cir. 2004) ..................................................40

*United States v. Mikell,*
   102 F.3d 470 (11th Cir. 1996). ......................................................56

*United States v. Orton*,
   73 F.3d 331, 333 (11th Cir. 1996) ...................................................43

**Cases**                                                                                          **Page**

*United States v. Riccardi,*
    989 F.3d 476 (6th Cir. 2021) .................................................................32

*United States v. Schlei,*
    122 F.3d 944, 969-70 (11th Cir. 1997) ................................................53

*United States v. Slade*,
    631 F.3d 185, 191 (4th Cir. 2011) .......................................................29

*United States v. Starrett,*
    55 F.3d 1525, 1550 (11th Cir.1995) ...................................................53

*United States v. Stein*,
    846 F.3d 1135, 1140, 1154-56 (11th Cir. 2017) ............................ 4, 10, 30-39, 42

*United States v. Stevens,*
    997 F.3d 1307, 1314 (11th Cir. 2021) ..................................................31

*United States v. Takhalov*,
    827 F.3d 1307, 1312, 1315 (11th Cir. 2016) .............................................. 9, 23-24

*United States v. Tejas*,
    868 F.3d 1242, 1244 (11th Cir. 2017) .................................................. 10, 12-14

*United States v. Thomas*,
    176 F. App'x 997, 997 (11th Cir. 2006) .................................................56

*United States v. Valarezo-Orobio*,
    635 F.3d 1261, 1264 (11th Cir. 2011) ..................................................12

*United States v. Verdeza*,
    69 F.4th 780, 793–94 (11th Cir. 2023) .............................................. 31-32

*United States v. Wilson*,
    993 F.2d 214, 216 (11th Cir. 1993) ......................................................31

**Cases**                                                               **Page**

*United States v. Woodard,*
   459 F.3d 1078, 1087 (11th Cir. 2006). ........................................................ 43-44

*United States v. Young,*
   39 F.3d 1561, 1568-69 (11th Cir. 1994). ........................................................27

**Statutes**

15 U.S.C. § 77q (a) ........................................................................................2

15 U.S.C. §77x ...............................................................................................2

18 U.S.C. § 2 ..................................................................................................2

18 U.S.C. § 371 ..............................................................................................2

18 U.S.C. § 1349 .............................................................................................2

**Guidelines**

U.S.S.G. § 1B1.3, cmt. (n.2) ........................................................................40

U.S.S.G. § 2B1.1 ..........................................................................................35

U.S.S.G. § 2B1.1(b)(1) .................................................................................30

U.S.S.G. § 2B1.1(b)(1)(J). ............................................................................30

U.S.S.G. § 2B1.1(b)(20)(A) ................................................................... 13, 49

U.S.S.G. § 3B1.1 cmt.4 .................................................................................25

| **Rules** | **Page** |
|---|---|

11th Cir. R. 28-5 ........................................................................ xiii

Fed.R.App.P. 32(a)(5).................................................................. xiv

Fed.R.App.P. 32(a)(6).................................................................. xiv

Fed.R.App.P. 32(a)(7)(B) ............................................................ xiv

Fed.R.App.P. 32(a)(7)(B)(iii) ...................................................... xiv

Fed. R. Evid. 403 ............................................................... 54, 57

Fed. R. Evid. 608(a))....................................................................55

Fed. R.Crim.P. 16(a)(1)(G)...........................................................59

Securities Exchange Commission ("SEC") Rule 506 of Regulation D..................20

## United States Constitution

U.S. Const. amend. V.............................................................. 15, 53-55

U.S. Const. amend. VI .................................................................54

## EXPLANATION OF SYMBOLS

Appellant Horn was the Defendant below, and will be referred to by "Horn" or as the "Appellant." Plaintiff/Appellee United States will be referred to as the "government".

Per 11th Cir. R. 28-5, the transcripts for the trial, sentencing, and restitution hearings will be referred to by Document number in the Record of Appeal (e.g. "DE: 381"), and the page number reference in this *Initial Brief* will be the same as used by the court reporter (e.g. "DE: 381:114").

When referring to the Presentence Investigation Report ("PSR"), the PSR Document number in the Record of Appeal is DE 160, and the PSR *paragraph* number will follow (e.g. "DE:160:¶46").

## CERTIFICATE OF COMPLIANCE

### Certificate of Compliance With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1.     This *Initial Brief* complies with the type-volume limitation of Fed.R.App.P. 32(a)(7)(B) because it contains 12,937 words, excluding the parts exempted by Fed.R.App.P. 32(a)(7)(B)(iii).

2.     This *Initial Brief* complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Times New Roman version of Microsoft Word in size 14 pt font.

## STATEMENT OF JURISDICTION

This Court has jurisdiction of this case per 28 U.S.C. § 1291, because this is

a final judgment and sentence of a U.S. District Court in a criminal case.

## STATEMENT OF THE ISSUES

I.    Whether the evidence was insufficient to show Appellant Horn acted "willfully" and had the requisite criminal intent to defraud investors

II.    Whether the court below erred at sentencing when it made the finding Appellant Horn was an "organizer or leader" and gave Horn a 4-level enhancement

III.    Whether the court below erred at sentencing when it made the finding the "intended loss" amount was $3,750,000 and gave Horn an 18-level enhancement

IV.    Whether the court below erred at the restitution hearing when it made the finding the "actual loss" was $1,469,702

V.    Whether the court below erred when it made the finding at sentencing Horn was (i) an "officer" or "director" of a publicly traded company, (ii) a registered "broker" or "dealer", or a person associated with a broker or dealer, (iii) an investment advisor, or a person associated with an "investment advisor", and gave Horn a 4-level enhancement

**VI.** Whether the court below erred when it made the finding at sentencing of "10 or more victims" and gave Horn a 2-level enhancement

**VII.** Whether cumulative error was committed by the court below and government which denied Appellant Horn his constitutional due process right to a fair trial

## COURSE OF PROCEEDINGS and DISPOSITION BELOW

### A. Statement of the Case

This is the direct appeal of a judgment and sentence of imprisonment and restitution.

On or about 20th day of January, 2021, a seven count *Indictment* was filed in Miami against Horn charging him with: **Count 1** Conspiracy to commit mail fraud and wire fraud (18 U.S.C. § 1349), **Count 2** Conspiracy to defraud the United States (18 U.S.C. § 371), and **Counts 3-7** Securities fraud (15 U.S.C. §§ 77q (a) and 77x, and 18 U.S.C. § 2) [DE:1].

On or about April 11, 2022, a jury was selected [DE:227]. The jury trial was conducted from April 11 - April 19, 2022 [DE:227-232].

On April 19, 2022, the jury returned a verdict of Guilty as charged, with the exception of Count 3 which the court dismissed because the alleged victim did not

show up for trial [DE:232:114]. On September 22, 2022, the court below conducted a sentencing hearing and made a finding the "intended loss" was $3,750,000 which resulted in an 18-level increase [DE:233:18].

With a Base Offense level of 7, a 2-level increase for more than 10 victims, a 2-level increase for sophisticated means, a 4-level increase for an offense of conviction of violating securities law and the defendant was one of 4 categories (the court below didn't name which), a 4-level increase for "leader" role, with a Criminal History category I, Horn faced an advisory guideline range of 210 – 262 months [DE:160:¶¶ 63-74]. (Presentence Investigation Report)("PSR").

The court granted a *Booker* variance and sentenced Horn to imprisonment for 100 months, 3 years supervised release, and a special assessment of $600.00 [DE:233:40-41].

On or about December 21, 2022, a restitution hearing was held [DE:223]. The court used the "buyers only" method, found $1,469,702 in "actual loss", and ordered $1,469,702 in victim restitution was owed jointly and severally by Horn and co-defendant Plummer [DE:225].

A *Notice of Appeal* was timely filed. This direct appeal ensued. Horn remains incarcerated serving this sentence.

## B. Statement of the Facts

From October 2014 - April 2016, certain individuals were employed in a company called Sunset Capital Assets ("Sunset"). The owners/directors of Sunset, John Bert Watson, Sr. ("Watson, Sr.") and John Fritzbert Watson, Jr. ("Watson, Jr."), established Sunset's headquarters in Jacksonville, FL. The Watsons raised money by offering restricted shares of Sunset to the public in a private placement. Horn's office was in Broward County, FL, about 320 miles away.

The FBI considered Watson, Sr. and Watson, Jr. at the top of the Sunset fraud [DE:229:190]. Watson, Jr. was involved in another fraud with Teets and others; Watson, Jr. often used people who had no knowledge they were helping a fraud scheme [DE:229:205-06]. Watson, Jr. kept information from Sunset executives because he opened accounts in different banks where they weren't signatories, so they couldn't see the money flow [DE:230:16].

Money from investors went directly to accounts controlled by the Watsons, who controlled Sunset [DE:229:113,116]. With these restricted shares, a stockholder had to hold the shares for 1 year, then go through a process with a 3rd party agent to get the stock unrestricted to sell the shares. Virtually none of the alleged victims went through this process to sell their Sunset stock.

Watson, Sr., was the Chairman of Sunset and Watson, Jr., Chief Investment Officer. Other Officers in the company were Alan Speck, Chief Executive Officer;

Jeff Betros, President; Cynthia Delaparte, Chief Financial Officer. These Sunset officers, along with 3 sales agents, were *not* charged in the *Indictment.*

At the time of trial, Watson, Sr. was deceased, and Watson, Jr. was a fugitive from justice who fled the United States and is living in Nicaragua. Teets was in prison serving a life sentence for murdering his girlfriend [DE:229:141-143].

Sunset stock was a legitimate stock publicly traded from 2012 to the time of the Horn sentencing and after [DE:231:66-67, 69]. Its stock prices were available online including the times of the conspiracies alleged in the Horn *Indictment*. Sunset offered "private placement", meaning its shares were not offered on the stock exchange, but issued by Sunset. Sunset sold the stock by using brokers and sales agents it enlisted.

Sunset also provided a 5-page promotional flyer titled, "A Must Read for Valued Investors". Horn was not involved in the preparation of either the Private Placement Memorandum ("PPM") or the 5-page flyer.

The Watsons hired Royce Teets ("Teets") to sell Sunset stock. Appellant Horn signed a written contract prepared by Watson, Jr. in which Horn was employed as his administrative assistant [DE:230:163]. Horn was initially paid with 25,000 Sunset restricted shares [DE:233:4]. Teets and co-defendant Plummer, a sales agent, and others made cold calls to potential investors to interest them in buying shares of Sunset stock.

If a potential investor showed an interest in buying Sunset stock, there was often a follow-up call or mailing to continue the sales effort. Horn's signature was unnecessary to sell stocks [DE:229:31]. Watson, Jr. gave Horn all directions on what to do [DE:229:43]. As the alleged victims testified at trial, each investor actually received the exact amount of Sunset shares for which he paid.

After Plummer or another sales agent found somebody interested in buying Sunset stock, Watson, Jr. would direct Horn to email the PPM and the 5-page flyer to that person. Investors would sometimes call Horn and say "Bert (Watson, Jr.) promised me certain information or documents that I have not received", so Horn would send the requested documents.

In October 25, 2014, Watson, Jr. (not Horn) sent an email describing how he would distribute commissions to himself, Teets, and Horn from funds received from an investor [229:167-170]. Watson, Jr. kept control of the vast majority of the investor funds. The vast majority of investor funds going into Sunset was paid out to other individuals (not Horn) [DE:229:85-86,88-98]. Teets, along with Horn's Florida corporation, Genesis (a student loan reduction company formed 1½ years before Horn worked for Sunset) Genesis bank account received about $640,000 to pay employees, etc. [DE:229:103-107,109-110] [DE:233:5].

Investors' money went to at least 4 banks before it came to Genesis [DE:229:119]. Genesis itself received about $182,027 during the alleged conspiracy

[DE:229:82]. But after paying office rent, buying office furniture, distributing money to employees, etc., Horn himself received for his personal use about $25,600 over 19 months (about $8.50 an hour) [DE:229:84,120-21,131-33]. Horn did not receive money from any other entities [DE:229:131-32].

Teets sent Horn $100,000 from Teets' corporation, with instructions to send it from Genesis to co-defendant Plummer. Some investors asked if there was a commission paid to the brokers, but many did not ask (or care). Capital assets can be distributed at any time as management sees fit. Funds received by employees are not automatically "commissions".

The PPM and 5-page flyer stated Sunset was a diversified financial services holding company headquartered in Jacksonville, FL. These 2 documents also listed certain assets of Sunset (e.g. gemstones and their appraisals, antiquities, objects of art, etc.). Many of these assets were shown by Watson, Jr., to Horn who believed the assets were valuable.

## SUMMARY OF THE ARGUMENT and STANDARD OF REVIEW

In **Argument I**, Horn asserts the evidence was insufficient to show he acted willfully with the requisite criminal intent to defraud or harm investors. To the contrary, the evidence showed Horn believed Sunset was a legitimate corporation selling stocks with value. He was initially paid in 25,000 shares of Sunset stock [DE:233:4]. He invited his own father to buy Sunset stocks. His father bought

$50,000 worth of restricted Sunset stock, went through the process to get them unrestricted, sold them, then realizing a profit of $30,000 (60% return on investment).

There was no testimony from any alleged victims they went through the agreed process to get their respective shares unrestricted, and tried to sell them. So they had no "loss", as they decided to keep their Sunset stock.

Horn was duped by Watson, Sr. and Watson, Jr., and was a "victim" of their fraudulent misrepresentations about the value of Sunset's assets. Watson, Jr. showed Horn many of the Sunset assets (i.e. gemstones with appraisals, artifacts, documents showing hard assets, etc.). Horn only repeated to potential investors what he had been told and shown by Watson, Jr.

An expert who did an appraisal of the gems and artifacts testified they had high value. Mr. Olund, who hired another expert to appraise the Sunset assets, also testified the assets had high value.

Per his written contract with Sunset, Horn's role was basically an administrative assistant. Horn did not work in-house at Sunset headquarters. He did not help create the PPM, the Subscription Agreement, or the Must Read for Sunset Investors. He only emailed information to investors when told to do so by Watson, Jr. or others. Horn did not solicit or directly call potential investors to convince them to buy Sunset stock. There were no phone records at trial of Sunset or Horn which

showed Horn called potential investors. Also, he did not collect funds from investors.

Many Sunset corporate executives, its Certified Public Accountant ("CPA"), and the Sunset attorney testified they saw no fraud at Sunset, and they were not charged in this case. This shows how Watson, Sr. and Watson, Jr. created an air of legitimacy in-house at Sunset. These corporate executives and attorney were far more sophisticated in the business world than Horn, whose immediate previous employment was at a lawn sprinkler repair company.

The standard of review for sufficiency of the evidence is a question of law which this Court reviews *de novo*. *United States v. Joseph,* 709 F.3d 1082, 1093 (11th Cir. 2013). In a fraud case, a defendant may have knowledge of "deceit", but if the defendant does not intend to harm the person, "then he has not intended to defraud the victim." *United States* v. *Takhalov*, 827 F.3d 1307, 1312 (11th Cir. 2016).

In **Argument II,** Horn asserts the court below erred at sentencing when it determined he was an "organizer" or "leader" and gave him a 4-level enhancement. Horn did not give orders or directions to any Sunset employees, or manage or supervise them.

The standard of review of a district court's interpretation and application of the sentencing guidelines is *de novo,* but it accepts its factual findings unless they are clearly erroneous. *United States v. Tejas*, 868 F.3d 1242, 1244 (11th Cir. 2017).

In **Argument III,** Horn asserts the court below erred at sentencing when it did not apply the unambiguous text of U.S.S.G. §2B1.1(b)(1) in determining actual "loss", but for sentencing used the "intended loss" referenced in Application Note 3(A) of the Guidelines Commentary.

It also erred when it calculated "intended loss" amount. Because Sunset stock had value, any alleged "loss" would have to be determined on an investor-by-investor basis. But the court below used the incorrect "buyers only" formula, simply taking number of total shares at the initial offering, multiplied by dollar amount per share. But it gave no credit against the loss for the value of the stock, or any profits made when shares were sold.

The court below also erred when it did not consider 4 intervening factors not foreseeable to Horn in 2015: (1) Sunset shareholders not going through agreed-upon procedure to sell their stocks, (2) the Sunset merger with Aphex, a company in an unrelated industry, (3) Aphex paying $7,837,875 on Sunset debt, and (4) Aphex filing for bankruptcy.

The trial court only heard from 4 alleged victims and used this largely to base its "loss" findings. But these 4 alleged victims testified they did not try to get their

stock unrestricted, or sell it. Two individuals (Arnold Horn and CEO Speck) who got their stock unrestricted, sold it, and respectively made $30,000 and $60,000 profit [DE:230:22].

Any purchase of stock has risks involved. No profit on shares does not mean fraud by Sunset. Especially if the purchaser of the shares does not start the agreed-upon procedure to sell the shares. Not one purchaser of Sunset stock made any complaint to a regulatory or law enforcement agency before the FBI contacted Sunset stock purchasers and began its investigation.

The court below erred by not tailoring the "intended loss" amount to what was reasonably foreseeable to Horn in 2015. Because he was only an administrative assistant, he was not privy to the corporate activity or assets of Sunset like Watson, Sr., or Watson, Jr. This is like holding a Shell gas station attendant responsible for all the activities of the corporate executives at Shell Oil Company.

Further, Horn confronted Watson, Jr. regarding his failure to follow through on promises regarding buying assets or completing mergers for Sunset. Because of these failed promises, Horn left Sunset on November 16, 2015. So he should not be responsible for any losses which occurred at Sunset months *after* that date.

But the court below still held him responsible for those later losses. During Horn's tenure at Sunset, investors paid $1,469,702. Horn was directly given $182,000, from which he was directed to pay employees, office rent, etc.

[DE:233:5]. Horn personally only received $25,600 over a 19-month period (about $8.50/hour). Is this the economic payoff for a "leader" when Sunset received $1,469,702?

The standard of review for "loss" determination is clear error. *United States v. Cabrera*, 172 F.3d 1287, 1292 (11th Cir. 1999). This Court will overturn a court's loss calculation under the clear error standard when the Court is left with a definite and firm conviction that a mistake has been committed. *United States v. Campbell*, 765 F.3d 1291, 1302 (11th Cir. 2014).

This Court reviews a district court's interpretation and application of the sentencing guidelines *de novo*, but accepts its factual findings unless they are clearly erroneous. *United States v. Tejas*, 868 F.3d 1242, 1244 (11th Cir. 2017). Whether a co-conspirator's act was reasonably foreseeable to the defendant so it qualifies as relevant conduct for sentencing is a question of fact reviewed for clear error. *United States v. Valarezo-Orobio*, 635 F.3d 1261, 1264 (11th Cir. 2011).

In **Argument IV**, Horn asserts the court below erred when it determined the "actual loss" amount of $1,469,702 at the restitution hearing [DE:238:26]. The government suggested, and the court adopted the same inaccurate "buyers only" theory in determining the "actual loss" amount, as it did above in determining the "intended loss" amount. It simply took the total number of shares sold, multiplied by actual dollar amount paid per share.

But Sunset stock had value. The investors got the shares of stock they paid for. Any purchase of stock has the risk of the value of the stock fluctuating. Other factors must be credited against loss (e.g. value of the stock, profits made from the sale of the stock, intervening events not foreseeable to Horn, stockholder not trying to sell stocks, etc.).

So the court below cannot simply take the money actually paid by investors as the "actual loss" amount.

The standard of review for "loss" determination is clear error. *United States v. Cabrera*, 172 F.3d 1287, 1292 (11th Cir. 1999).

In **Argument V**, Horn also asserts the court below erred at sentencing when it determined he was (i) an officer or director of a publicly traded company, (ii) a registered broker or dealer, or a person associated with a broker or dealer, (iii) an investment advisor, or a person associated with an investment advisor, then gave him a 4-level enhancement per § 2B1.1(b)(20)(A) [DE:233:18] [DE:160:¶67].

Horn asserts he was none of those 3 categories, and should not have received that 4-level enhancement. The court below did not even state its finding as to which category Horn fit.

The standard of review is this Court reviews a district court's interpretation and application of the sentencing guidelines *de novo* , but accepts its factual findings

unless they are clearly erroneous. *United States v. Tejas*, 868 F.3d 1242, 1244 (11th Cir. 2017).

In **Argument VI**, the court below erred at sentencing when it gave a 2-level increase for "10 or more victims". The court made no specific finding identifying who the alleged victims were. Because Horn had no intent to harm anyone, there were no victims.

The standard of review is this Court reviews a district court's interpretation and application of the sentencing guidelines *de novo*, but accepts its factual findings unless they are clearly erroneous. *United States v. Tejas*, 868 F.3d 1242, 1244 (11th Cir. 2017).

In **Argument VII**, cumulative error was committed by the trial court and government which denied Horn his right to a fair trial.

The court below erred when it did not allow counsel for Horn to argue the affirmative defense of a Statute of Limitations violation. In his closing argument, counsel for Horn began to argue a Statute of Limitations violation. The court below sustained the government's objection, and did not permit counsel to argue it further.

The facts to prove the Statute of Limitations defense were in the trial record. However, the trial court abused its discretion by *not* (a) stopping the trial, (b) conducting an attorneys only mini-charge conference, (c) crafting a Statute of Limitations jury instruction, and (d) allowing counsel to argue it to the jury.

This is an affirmative defense which *alone* could yield a "not guilty" verdict. So the court's error in not allowing Horn's counsel to present it to the jury is more prejudicial than most evidentiary rulings or jury instructions.

The standard of review for statute of limitations interpretation and application is *de novo*. *Tello v. Dean Witter Reynolds, Inc.,* 410 F.3d 1275, 1278 (11th Cir. 2005) (quoting *United States v. Clar*ke, 312 F.3d 1343, 1345 n.1 (11th Cir. 2002)). The standard of review for refusal to give a requested jury instruction is abuse of discretion. *United States v. Joseph,* 709 F.3d 1082, 1093 (11th Cir. 2013).

Horn's Fifth Amendment right not to incriminate himself was violated by FBI Agent Palomares' trial testimony "I tried to get an in-person interview with Horn but was unsuccessful". The jury could easily infer Horn evaded the interview because it would incriminate him. The prejudice to Horn resulting from this gratuitous statement by the Agent was far greater than its probative value. This, coupled with Horn not testifying gives the jury an inference Horn must be guilty because he was not willing to be questioned by agents or cross-examined by prosecutors.

The court below also erred by allowing evidence Horn did not file a tax return for the years of the charged conspiracy. This was not relevant to the fraud charges. Also, there are *many* legitimate reasons tax returns are not filed at a certain time.

The court below also erred by letting a government witness testify as an "expert", without the government having given pre-trial notice of this designation.

Horn's defense was prejudiced because it was not able to prepare cross-examination of an "expert" witness, or obtain a defense expert to counter the government's expert.

The cumulative effect of *all* these prejudicial errors (plus the error cited in the other Arguments) justifies a new trial.

The standard of review is this Court will reverse a conviction if the cumulative effect of error is prejudicial, even if the prejudice caused by each individual error was harmless. *United States v. Baker*, 432 F.3d 1189, 1203, 1223 (11th Cir. 2005).

The standard of review for evidentiary rulings involving expert witnesses is abuse of discretion. *United States v. Holland*, 223 F. App'x 891, 892 (11th Cir. 2007).

## ARGUMENT

**Argument I**

**The evidence was insufficient to show Appellant Horn acted "willfully" and had the requisite criminal intent to defraud investors**

In the light most favorable to the government, the evidence is insufficient to prove Horn had criminal intent to sell "worthless" stocks and harm investors.

Government witness Klimczak, the independent stock transfer agent who sold the Sunset stocks to investors, testified he saw nothing about the way Sunset did business as a red light that it was doing something wrong; if so, this company

wouldn't have done business with Sunset [DE:229:47]. This is the same opinion Horn had.

## A. Horn invited his father to buy Sunset stocks

Alleged victim Wetch testified Horn told him "I put my dad in [Sunset stock]", and described his other interactions with Horn *after* he decided to purchase his Sunset shares [DE:230:46-64,115]. Horn's dad, Arnold Horn, invested in Sunset stock and made a $30,000 profit when he sold the stock shortly after January 27, 2021 [DE:229:47].

Arnold Horn describes how he invested in Sunset, and the $30k profit he made [DE:231:106-120]. He read to the jury the part of the PPM which set out the risks involved in stock purchase [DE:231:137-38]. So all Sunset stock purchasers were put on notice of these risks.

## B. Horn was duped by Watson, Sr. Watson Jr., and Sunset executives and was a "victim" like investors

**i**. Watson, Jr., showed Horn Sunset corporate assets and convinced him Sunset was legitimate [DE:229:195]

**ii**. Horn only repeated what he had been shown and told by Watson, Jr.

**iii**. Expert testified Sunset artifacts and gems listed as assets had value

Expert Appraiser Budhram said the emeralds and Indian figurines shown him by Watson, Jr. were authentic [DE:230:196-99, 213-16]. Horn

also believed the emeralds and Indian figurines, etc., were authentic when shown to him by Watson, Jr.

**iv.** Horn was only an administrative assistant and did not create the Personal Placement Memorandum ("PPM"), Subscription Agreement, or A Must Read for Sunset Investors

Evidence showed Horn's limited role. He was *not* involved in creating the three most important documents for shareholders to learn about Sunset. Specifically, he had nothing to do with the creation of the PPM, Subscription Agreement, or A Must Read for Sunset Investors [DE:229:199] [DE:230:31-32] [DE:231:39].

Horn only emailed information to investors when told by Watson, Jr. or others [DE:231:17-18, 23, 33-34].

## C. Horn believed Sunset's PPM, and gem and artifacts appraisal

In Horn's defense case, he further showed why he believed the Sunset stocks were legitimate and had value [DE:231]. Horn believed Sunset's PPM, and gem and artifacts appraisal [DE:229:195]. Horn's father, Arnold Horn, testified how and what he invested in Sunset, and the $30,000 profit he made [DE:231:106-20].

Additionally, Arnold Horn, a former Price Waterhouse executive, defined "working capital" as money used to run the company, and a company can

legitimately pay employees and commissions from working capital [DE:231:138]. The Watsons spent $250,000 for marketing, which is not a sales commission.

Just because investor funds are paid to Sunset does not mean they are "commissions" – a commission is usually based on a specific sale of stock by a certain investor [DE:231:138]. Alleged victim Olerud said he knew nothing about commissions to be paid to Sunset [DE:231:45- 46].

Horn's dad testified to language in his documents with Sunset regarding not paying broker's fee to any "3rd party", i.e. someone not associated with Sunset or a stock purchaser [DE:231:138-39]. Employees of Sunset are not "3rd parties", so *could* receive a commission per Sunset documents [DE:231:138-39].

Mr. Olund, a former employee of Watson Sr., is a sophisticated businessman [DE:231:60]. He worked at American Express, had a real estate background, and had a Series-7 securities license [DE:231:59-60]. Olund spent two years examining the Sunset gems, statues, and other artifacts in the storage facility, and spent $80,000 of his own money to determine whether the Sunset gems and other listed assets had value [DE:231:62- 64, 67, 70, 83-86].

Olund, using a gemstone expert, determined Sunset's gemstones were genuine [DE:231:62-64, 86]. He also testified about Sunset's then current status as a legitimate ongoing business.[DE:231:74-80]. Olund owned 10% of Aphex (disinfecting technology company), which unexpectedly bought by Sunset in July

2020 [DE:231:71-74, 82]. Sunset shareholders still own 10% of Sunset now; they previously owned 100%, so the shares diluted [DE:231:74-75]. The Sunset financial statement lists as assets fine art, hard assets, etc. in exchange for stock, but the assets have been lost, so a net value of zero [DE:231:79-80]. Horn could not have reasonably foreseen in 2015 this intervening event of the Sunset merger with Aphex.

Alleged victim Dr. Pankey, an oral surgeon, also qualified as a "sophisticated investor" [DE:230:173]. So the Securities Exchange Commission ("SEC") assumes he (and others like him) were well aware of how to check out Sunset's value of shares in the stock market.

Many of the alleged victims were "accredited investors" per  SEC Rule 506 of Regulation D [DE:231:28-30]. An "accredited investor" is defined by the SEC as: "an individual with a net worth over $1 million, excluding primary residence (individually or with spouse or partner), income over $200,000 (individually) or $300,000 (with spouse or partner) in each of the prior 2 years, or investment professionals in good standing holding the general securities representative license (Series 7)…" See  http://www.SEC.gov.

A "sophisticated investor" is one who has enough knowledge and experience in financial and business matters to make them capable of evaluating the merits and risks of the prospective investment. See http://www.investor.gov.

Alleged victim Olerud admitted he was an "accredited investor" when he gave Sunset his money for shares [DE:231:30, 54]. Why is this important? The SEC considers accredited investors and sophisticated investors knowledgeable enough in buying securities, to require less information given them by the company selling the stock, than an individual who is *not* as knowledgeable.

So Sunset need not give accredited or sophisticated investors as much in-depth information on which they will base their purchase decision.

**D. Independent stock transfer agent for Sunset and Sunset corporate executives all testified they saw no fraud**

Witness Klimczak, manager at Issuer Direct (stock transfer company that issued Sunset stock), testified he saw nothing wrong with how Sunset did business; if so, Issuer Direct would not have done business with Sunset [DE:229:21, 47].

Sunset officers Alan Speck (CEO), Jeff Betros (President), Cynthia Delaparte (CFO of the Sunset Board of Directors), and Dan Vaughn (Sunset Attorney) stated to the FBI they were not aware of any fraud at Sunset. All were listed in the PPM, an important source of information for investors about Sunset. *None were charged by the government.*

Sunset CFO Delaparte testified she saw no fraud, and the numbers inputted into system were correct, and she did not know of Horn [DE:228:139, 161, 164]. Sunset

President Betros testified he did not think he was part of a fraud, and named the owners of the gems and antiquities shown as assets of Sunset [DE:228:212, 219].

Sunset CEO Speck testified he signed OTC market filings and disclosures, but did not check them; he trusted the information presented by the accountant [DE:228:33]. Speck also never heard of Horn [DE:228:69]. Horn similarly trusted the Sunset officers, assuming the Board of Directors, CPA, and attorney were legitimately performing their assigned duties.

This markedly contrasts with the facts in *United States v. Chalker*, 966 F.3d 1177, 1192 (11th Cir. 2020). The *Chalker* Court held the government introduced sufficient evidence to let a reasonable jury find beyond a reasonable doubt Chalker conspired to commit healthcare fraud. The evidence showed Chalker's pharmacy filled medically unnecessary prescriptions for patients who neither wanted nor needed them.

The *Chalker* type of blatant fraud is not present regarding Horn. There is no evidence beyond a reasonable doubt Horn had fraudulent intent in his dealings at Sunset.

But there is abundant evidence to show he was as much a victim of the Watsons as any investor. Horn's dad testified his son was devastated when he realized Sunset was a scam company, and the Watsons weren't going to do everything they promised to him and investors – he felt conned [DE:231:119].

## E.  Investors "got what they paid for"

The following chart shows investors received the Sunset shares they purchased:

| Alleged victim | # shares paid for | # shares received | DE |
|---|---|---|---|
| Wetch | 9,524 and 11,111 | 9,524 and 11,111 | 230:10,74 |
| Caruso | 10,000 | 10,000 | 230:134,166-69 |
| Olerud | 20,000 (at $1.15) | 17,000 + | 231:27-28,40 |
| Pankey | 25,000 (at $1.25) | 20,000 | 230:176-77 |

This shows there was no fraud by Horn. Deception alone does not constitute a scheme to defraud; a defendant must intend to cause injury or loss. *United States v. Takhalov,* 827 F.3d 1307, 1313 (11th Cir. 2016) ("A jury cannot convict a defendant of wire fraud, then, based on misrepresentations amounting only to a deceit." (internal quotation marks and citation omitted)).

The government's theory of the case is the owners of Sunset and its salesmen took money from investors and enriched themselves, so the investors did not get what they paid for [DE:238:5, 26]. But the *Takhalov* case shows the Sunset investors got what they paid for. In *Takhalov,* men were lured into bars by girls, and charged thousands of dollars on their credit card for overpriced drinks. But this Court dismissed the wire fraud counts.

The *Takhalov* Court held the alleged victims "got what they paid for" (holding in part "[a]nd if someone is lured to a bar under false pretenses but nevertheless gets

precisely what he pays for, he has hardly been "deceive[d] or cheat[ed] out of money or property.") *Takhalov*, 827 F.3d at 1317.

Horn had no intent to cause injury or loss. So a jury cannot convict Horn of wire fraud, based on misrepresentations amounting only to a deceit per *Takhalov, supra.*

## Argument II
## The court below erred when it made the finding Horn was an "organizer" or "leader"

At the sentencing hearing, counsel for Horn objected to the 4-level enhancement for "organizer" or "leader" [DE:160:¶69] [DE:233:10]. The court below denied this objection, and applied this enhancement [DE:233:18]. Common sense reveals Horn does not come close to being an "organizer" or "leader" at Sunset.

Money defines relationships. Does a "leader" get $8.50 an hour out of the $1,469,702 paid by investors? Compare this to the nearly 7-figure payout received by Watson, Sr. and Watson, Jr., and nearly $450,000 to Teets [DE:233:6-7]. Those 3 individuals were the "leaders" at Sunset.

Also, number of shares given as initial payment defines relationships. Horn got 25,000 restricted shares of Sunset stock as his first compensation [DE:233:4]. Is a fraudster going to receive payment-in-kind of shares he knows are worthless? Compare this to CEO Speck's 150,000 Sunset shares, President Betros' 250,000 Sunset shares, and CFO Delaparte's 150,000 Sunset shares [DE:229:193].

Organizational titles and hierarchy determine relationships. The FBI testified the PPM is a significant part of the investigation, as it disclosed important information to investors who relied on it in their decision to invest in Sunset [DE:229:195]. All the corporate officers and the accountant were listed in the PPM. But *not* Horn [DE:229:196-7].

This Court's precedent reveals Horn *does not come close* to being an "organizer" or "leader" at Sunset. In deciding whether a defendant is an "organizer" or "leader", the Guidelines list 7 factors to consider: (1) exercising decision-making authority, (2) the nature of participation in the commission of the offense, (3) the recruitment of accomplices, (4) the claimed right to a larger share of the fruits of the crime, (5) the degree of participation in planning or organizing the offense, (6) the nature and scope of the illegal activity, and (7) the degrees of control and authority exercised over others. U.S.S.G. § 3B1.1 cmt.4. *See United States v. Jennings*, 599 F.3d 1241, 1253 (11th Cir. 2010).; *United States v. Martinez,* 584 F.3d 1022, 1026 (11th Cir. 2009).

When examining Horn's participation at Sunset, his role as a glorified secretary falls short of these factors because he: (1) had no decision-making authority, (2) was an administrative assistant to Watson, Jr., sending emails, funds, or mailings as directed [DE:230:163], (3) recruited no one [DE:230:34], (4) was paid an $8.50 an hour minimum wage from the $1,469,720 paid by investors, (5) did no

planning or organizing, (6) was duped by Watson, Jr., into believing there was no illegal activity, and (7) had no control or authority over anyone.

FBI Agent Ford testified the 3 employees Horn was directed to pay (Clark, Marchiano, and Braxton) were on the same level as Horn, but not charged [DE:229:133]. Those 3 are not "organizers", so neither is Horn.

Horn only forwarded emails from Sunset employee Teets to alleged victim Olerud, and did other ministerial acts as administrative assistant to Watson, Jr. [DE:231:17, 23, 25-32, 133]. Horn did not recruit sales people [DE:230:34]. Olerud did not talk to Horn; he only saw Horn's name on an email [DE:231:15, 43-44]. Olerud spoke to Teets only.

This Court has repeatedly stressed an enhancement for one's role in the offense requires showing the defendant *managed people*, rather than assets, with control or influence over the individual. See *United States v. Jennings,* 599 F.3d 1241, 1253 (11th Cir. 2010); *United States v. Campa,* 529 F.3d 980, 1013 (11th Cir. 2008). Horn managed no one.

In *United States v. Martinez,* 584 F. 3d 1022 (11th Cir. 2009), this Court held there was no evidence in the record to support a 4-level aggravating role adjustment. Though Martinez acknowledged during the entry of the plea he "orchestrated" drug shipments, that admission did not necessarily mean he controlled, supervised or managed people in the endeavor. *Id.* at 1029. That Martinez arranged for the delivery

and sale of drugs between the buyer and seller is not enough to demonstrate a leadership role under §3B1.1(a)." *Id.* at 1028.

Similarly, the government claims Horn helped orchestrate or arrange for sales of Sunset stock to investors. But this does not show he *controlled*, *supervised* or *managed people* in the endeavor per *Martinez, supra.*

This Court reversed a 4-level enhancement in *United States v. Alred,* 144 F. 3d 1405, 1421-22 (11th Cir. 1998). The defendant was shown only to have been a middleman supplier of marijuana. It was not shown he organized his purchasers or actively recruited them. In that vein, Horn was only a middleman supplier of Sunset shares. But there is no evidence to show he organized or supervised anyone at Sunset.

This Court has also found evidence was lacking for this "leader" role enhancement in *United States v. Young,* 39 F. 3d 1561, 1568-69 (11th Cir. 1994). Though the defendant was knowledgeable about the marijuana business, and harvested and bagged the marijuana plants there was no evidence he exercised any supervisory or managerial role over the operation.

Horn may have known about the sale of stock to the public. But because he exercised no supervisory or managerial role over others in the operation, he should not be enhanced for role per *Young, supra.*

While Horn may have distributed *funds* to employees at the direction of Watson, Jr., (assets), he did *not manage people*.

This Court found the "organizer" and "leader" enhancement was not proper under facts like Horn's facts. In *United States v. Lozano-Hernandez*, 89 F. 3d 785, 790 (11th Cir. 1996), the defendant was the intended purchaser of 10 kilos of cocaine, and had the money to do so. But there was "absolutely no evidence he supervised or controlled anyone," or otherwise organized any other participant in the conspiracy. *Id.* at 790.The same result should lie here. See also *United States v. Glinton*, 154 F.3d 1245, 1260 (11th Cir. 1998)(holding just because defendant bought more cocaine from supplier than any other defendant did not support a managerial enhancement); *United States v. Beasley,* 2 F.3d 1551, 1562-63 (11th Cir. 1993) (holding the enhancement of Beasley's sentence was not supported by the evidence because he was only a drug purchaser and seller who did not exercise authority or control over others, so he was not an "organizer"); *United States v. Markovic*, 911 F.2d 613, 616-17 (11th Cir. 1990)(finding the role enhancement was not proper because of a complete lack of proof defendant's activities were management of other participants). There is a complete lack of proof of Horn's management of other participants.

In *U.S. v. Lamont Johnson,* 64 F.4th 1348, 1352 (D.C. Cir. 2023), although the district court found Johnson "managed or supervised" five people during a drug

trafficking conspiracy, the *Johnson* Court on appeal held the evidence was insufficient to support this conclusion.

In so ruling, the *Johnson* panel rejected three government arguments. First, the government alleged Johnson "managed or supervised" his wife while conducting his drug business; the evidence showed, however, the wife repeatedly argued with Johnson over what she would do in support of his activities. *Id.* at 1353. The *Johnson* court found his wife was no "underling," and Johnson was no "commander" with "authority to direct her"…"evidence of control is particularly weak given the spousal relationship." *Id.* (citations omitted).

Second, the government alleged Johnson managed or supervised three co-defendants because he told them the location of where to turn over the drugs and asked them to come alone. *Id*. This evidence "reveals nothing more than a seller setting the terms of sale," and is not sufficient to show Johnson "'exercised supervisory responsibility over those he supplied.'" *Id.* (quoting *United States v. Slade*, 631 F.3d 185, 191 (4th Cir. 2011)).

Third, the government alleged Johnson "managed or supervised" a potential buyer. *Id*. at 1353. The *Johnson* court found evidence was insufficient to support this claim, because "[Johnson's] only known contact with the potential buyer was to warn him against texting in uncoded language." *Id.*

Using the *Johnson* reasoning, this Court can see Horn is *not* an organizer or leader at Sunset. Horn did not (1) manage or supervise any employees, (2) had no authority to direct or control others, (3) did not set stock prices, or (4) did not determine how investor funds were distributed.

**Argument III**

**The court below erred at sentencing when it made the finding the "intended loss" amount was $3,750,000 and gave Horn an 18-level enhancement**

At the sentencing hearing, Horn objected to the use of *intended* loss for sentencing purposes because *actual* loss should be used [DE:182:3]. Horn objected to the PSR statement the "intended loss" was $3,750,000 [DE:160:¶5] [DE:182:2-3]. The court below overruled the objection, found the intended loss was $3,750,000, and gave an 18-level increase per U.S.S.G. § 2B1.1(b)(1)(J) [DE:233:18].

A review of the relevant facts and this Court's precedents shows the court below erred (1) by using "intended loss" and not "actual loss" for sentencing purposes, and (2) in the manner and procedure it used to determine intended loss and actual loss.

**The court below erred by not following the unambiguous text of U.S.S.G. §2B1.1(b)(1) and using "actual loss" for sentencing purposes**

In *United States v. Dupree*, 57 F.4th 1269 (11th Cir. 2023) (*en banc*), this Court discussed the effect of the Supreme Court's decision in *Kisor v. Wilkie*, 139

30

S. Ct. 2400 (2019), on its earlier decision in *Stinson v. United States*, 508 U.S. 36 (1993). *Stinson* provided the Sentencing Commission's commentary on the Guidelines "was binding on federal courts unless the commentary was 'plainly erroneous or inconsistent with the guideline itself, a federal statute, or the Constitution.'" *United States v. Corker*, No. 22-10192, at *11-12 (11th Cir. Feb. 6, 2023) (unpublished), *United States v. Verdeza*, 69 F.4th 780, 793–94 (11th Cir. 2023) (alteration accepted) (quoting *United States v. Wilson*, 993 F.2d 214, 216 (11th Cir. 1993), *overruling recognized by Verdeza*, 69 F.4th at 793).

But that changed when this Court applied "*Kisor*'s gloss on [*Auer v. Robbins*, 519 U.S. 452 (1997)] and [*Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945)]" to *Stinson*. *Dupree*, 57 F.4th at 1275. In applying *Kisor* to *Stinson*, this Court "overruled [Circuit] precedent on how the Guidelines and the commentary interact." *Verdeza*, 69 F.4th at 793.

Now, when a court in this Circuit is faced with a discrepancy between the Guidelines and the commentary, it must first "exhaust all the 'traditional tools' of construction" to determine if a guideline is genuinely ambiguous. *Dupree*, 57 F.4th at 1275 (quoting *Kisor*, 139 S. Ct. at 2415). If a guideline is unambiguous, "there is no plausible reason for deference" to the commentary, and the court must apply the guideline's unambiguous meaning. *See id.* (quoting *Kisor*, 139 S. Ct. at 2415). Generally, a court's inquiry "must begin, and usually end, with the text." *See United*

*States v. Stevens,* 997 F.3d 1307, 1314 (11th Cir. 2021).

Horn asserts because the text of §2B1.1(b)(1) "loss" is unambiguous, there is no need to resort to the Application Note 3(A) of the Guidelines commentary which expands the ordinary meaning of "loss" by instructing judges "loss is the greater of actual loss *or intended loss*" (emphasis added). *Compare United States v. Banks*, 55 F.4th 246, 257 (3d Cir. 2022) ("The ordinary meaning of 'loss' in the context of §2B1.1 is 'actual loss.'"); *United States v. Kennert*, No. 22-1998, 2023 WL 4977456, at *4 (6th Cir. Aug. 3, 2023) (Murphy, J., concurring) (recognizing that "just because 'loss' can refer to different harms does not mean that it can refer to nonexistent ones too"); *United States v. Riccardi,* 989 F.3d 476 (6th Cir. 2021) (remanding for resentencing based on court using intended loss of $500 per gift card, and not using actual loss based on gift card's determinable face value of about $35 per gift card).

This Court has recognized, "whatever else *Dupree* did, it did not 'specifically and directly resolve' the question of whether §2B1.1's definition of 'loss' is ambiguous". *Verdeza,* 69 F.4th at 794. Horn asserts its definition is unambiguous.

On August 23, 2023, U.S. District Court Judge Ruiz in *United States v. Patel,* Case no. 19-CR-80181 (S.D.FL.)(Miami), entered his *Order* finding the U.S.S.G. §2B1.1 "loss" is unambiguous, and refers to actual loss for sentencing . So the Horn court erred by applying the commentary's "intended loss" at sentencing.

**The court below erred in the manner and procedure it used to determine the "intended loss" amount**

## A.     This Court's *Stein* decision is instructive

In *United States v. Stein*, 846 F. 3d 1135 (11th Cir. 2017), this Court vacated the sentence and remanded it back to the district court with instructions to calculate anew the amount of loss for U.S.S.G. § 2B1.1(b)(1) and restitution.

Specifically, the *Stein* Court concluded the court below erred in calculating an actual loss figure based on the losses of *all* investors, and did not determine whether intervening events caused the Signalife stock price to drop and, if so, whether these events were unforeseeable such that their effects should be subtracted from the actual loss figure. *Id.* at 1156.

To show an actual loss figure under the guidelines or for restitution based on investors' losses, the government must prove in purchasing Signalife stock, investors relied on the fraudulent information Stein distributed. The district court found over 2,000 investors relied on Stein's fraudulent information. But the only evidence supporting this finding was (1) the testimony of 2 individuals saying they relied on Stein's false press releases, and (2) generalized evidence some investors may rely on some public information. *Id.* at 1140.

The evidence in Horn was strikingly similar. Only 4 investors testified for the government. They were "accredited investors" or "sophisticated investors" who

relied only in part on the representations of Sunset, but mainly relied on their own experience in the stock market.

The *Stein* Court held this evidence was not enough to permit reliance on the misrepresentations to be inferred for over 2,000 investors. *Id.* at 1140. The district court erred in calculating an actual loss figure based on the losses of *all* these investors. *Id.* at 1140. The district court also failed to determine whether intervening events caused Signalife stock price to drop, and, if so, whether these events were unforeseeable such that their effects should be subtracted from the actual loss figure. *Id.* at 1154-56.

Similarly, the court below erred in relying mainly on the 4 Horn alleged victims in calculating "intended loss" and "actual loss".

Also, the court below erred in failing to determine whether intervening events caused Sunset stock price to drop and, if so, whether these events were unforeseeable so their effects should be subtracted from the actual loss figure per *Stein*. These intervening events were not reasonably foreseeable to Horn in 2015.

The first intervening event was the vast majority of Sunset shareholders would not go through with the agreed-upon process to get their stocks unrestricted to sell them [DE:230:103-04].

Horn's Dad's profit of $30,000 was not credited toward the loss amount, nor was the value of Sunset stock still held by shareholders [DE:233:3-4:21-25].

The second intervening event was not foreseeable to Horn. Effective July 31, 2020, Sunset was bought by/merged with Aphex BioCleanse Systems, Inc. ("Aphex"), an industry unrelated to the Sunset original business venture. Aphex was developing and selling a proprietary broad-based germ-killing formula [DE:238:23]. Aphex stock is *still* being sold on the stock market today (Aphex BioCleanse Systems Inc. stock symbol (SNST:OTCPK)). The government conceded this [DE:238:23]. But the court did not factor that into its loss calculation.

The third intervening event not foreseeable to Horn occurred on August 4, 2020. Aphex filed Completed Satisfactions of two Judicial Liens totaling $7,837,875 plus accruing statutory interest that remained on the Sunset balance sheet.

See https://www.prnewswire.com/news-releases/aphex-biocleanse-systems-inc-otc-snst-confirms-prior-judicial-liens-owed-by-predecessor-sunset-capital-assets-inc-as-satisfied-301105938.html. Were these funds provided to Sunset shareholders to offset any loss they may have had? This could be a credit against any loss finding by the court below.

The fourth intervening event not foreseeable to Horn was Sunset's successor business Aphex filed for Chapter 11 bankruptcy in U.S. Bankruptcy Court in the Middle District of Florida (Tampa Division) on May 12, 2022. The government conceded this [DE:233:15] [DE:238:23].

So the court below erred per *Stein* by not factoring these four intervening events not reasonably foreseeable to Horn in 2015 in its loss calculations.

**The court below used oft-criticized "buyers only" method to calculate loss**

The government must prove by a preponderance of the evidence actual loss attributable to the defendant's conduct. *Id.* at 1152. The *Stein* Court warned that while a sentencing court is not generally required to make detailed findings of individualized losses to each victim, it cannot "speculate about the existence of facts and must base its estimate on reliable and specific evidence." *Id.* at 1152.

But *speculating* about the existence of facts is exactly what the court below did. The *Stein* Court criticized the government's use of the "buyer's only" method, which is only based on actual purchase and sales data. *Id.* at 1144.

The *Stein* Court also criticized the court below for adopting the "buyer's only" method of calculating loss, given the lack of reliable and specific evidence of loss, reliance by investors on false statements of the defendant, not factoring the value of the stock and profits made from sale of stock, and intervening events not reasonably foreseen by defendant. *Id.* at 1156.

But the court and government in Horn used the "buyer's only" method of calculating loss [DE:238:5]. The *Stein* result should lie (i.e. remand for resentencing).

The *Stein* Court defined "actual loss" as the "reasonably foreseeable pecuniary harm that resulted from the offense". *Id.* at 1152. This definition "incorporates [a] causation standard that, at a minimum, requires factual causation (often called 'but for' causation) and provides a rule for legal causation (i.e. guidance to courts regarding how to draw the line as to what losses should be included and excluded from the loss determination)". *Id.* at 1152. Horn's court made no such finding of factual causation.

The government must show the investors relied on the defendant's fraudulent information to satisfy the "but for" causation requirement under U.S.S.G. § 2B1.1. *Id.* at 1153. The government also must show reliance to prove "but for" causation for restitution purposes. *Id.* at 1153. The government may show reliance in a securities fraud case either through direct evidence or specific circumstantial evidence. *Id.* at 1153. No Sunset investor relied on any misrepresentation generated by Horn, which Horn himself did not believe was true.

While recognizing that requiring individualized proof of reliance for each investor is often infeasible or impossible, the *Stein* Court held the government may offer specific circumstantial evidence from which the district court may reasonably conclude that all of the investors relied on the defendant's fraudulent information. *Id.* at 1153-54.

In *Stein*, however, the government did not satisfy either option. *Id.* at 1154. The district court's statement that "from the record there [was] sufficient evidence to demonstrate…reliance for 2,415 investors was erroneous". *Id.* at 1154. The government in Horn also failed to satisfy either option.

The *Stein* Court held "the record contains no direct individualized evidence of reliance for each investor", and the circumstantial evidence is far too limited to support a finding that 2,415 investors relied on the fraudulent information Stein disseminated. *Id.* at 1154.

The only evidence arguably supporting the reliance finding was: (1) trial testimony from one investor he relied on one of Stein's false press releases; (2) a victim impact statement from another investor to the same effect; (3) several victim impact statements suggesting that the investors relied on press releases and other publicly available information generally, but not specifically the fraudulent information Stein disseminated; and (4) testimony that because the only place to get information about Signalife stock was from press releases and public filings, at least some investors likely relied on this information when purchasing Signalife stock. *Id.* at 1154.

At bar, this *limited* circumstantial evidence in all four of the above areas was presented by the government. But per *Stein*, this is not sufficient to prove loss.

The *Stein* Court further opined it must consider reasonable foreseeability when assessing proximate cause for actual loss. *Id.* at 1155. When calculating actual loss the district court should consider intervening events contributing to the loss unless those events were reasonably foreseeable to the defendant. *Id.* at 1155. Horn lists above four intervening events contributing to the loss which were not reasonably foreseeable to him.

The *Stein* Court noted the district court erred in arriving at its loss and restitution calculations because it did not consider the intervening events of (1) Signalife stock value declined in part because of the short selling of over 22 million shares of Signalife stock, and (2) the across-the-board stock market decline of 2008. *Id.* at 1155. Horn's court similarly erred by not considering the 4 intervening events at bar.

The *Stein* Court said after Stein pointed to intervening events that may have affected the stock price, the district court had to make findings regarding the effects of these intervening events and whether these events were reasonably foreseeable to Stein. Because the court did not do so, the *Stein* Court vacated the sentencing order. *Id.* at 1156. The district court must subtract from the actual loss amount the monetary effect of such intervening event. *Id.* at 1156.

Horn's court made no such findings or adjustments for intervening events which were not foreseeable to him. So this Court should vacate the sentencing order per *Stein*.

### This Court's precedent regarding how to determine "loss" agrees with *Stein*

Horn's sentencing court did not make *individualized* findings as to Horn's criminal activity and foreseeability of loss [DE:233:18].

This Court has held the sentencing court should make individualized findings regarding the scope of criminal activity and foreseeability of loss. "A 'district court may hold participants in a conspiracy responsible for the losses resulting from the reasonably foreseeable acts of co-conspirators in furtherance of the conspiracy.'" *United States v. Mateos*, 623 F.3d 1350, 1370 (11th Cir. 2010) (quoting *United States v. Hunter*, 323 F.3d 1314, 1319 (11th Cir. 2003)).

In order to determine the accountability of the defendant in a criminal activity, the sentencing court must first make *individualized findings* regarding the scope of criminal activity undertaken by the defendant, then the court can make determinations as to foreseeability (emphasis added). *Hunter* at 1319 (citing U.S.S.G. § 1B1.3, cmt. (n.2)).

"Once the court determines the scope of the defendant's involvement in the conspiracy, it then may consider 'all reasonably foreseeable acts and omissions of others in the jointly undertaken criminal activity.'" *United States v. Mateos*, 623 F.3d

1350, 1370 (11th Cir. 2010) (citing *United States v. McCrimmon*, 362 F.3d 725, 731 (11th Cir. 2004)).

Horn left Sunset on Nov. 16, 2015 after his fallout with Watson, Jr. So any subsequent "loss" should not be attributed to him. Agent Palomares testified Horn's last check from Sunset was on November 16, 2015. FBI Agent Ford testified Horn's involvement did not continue past this last payment from Genesis [DE:229:134, 136]. The **Count 1** mail and wire fraud § 1349 conspiracy allegedly continued until April 2016, and the **Count 2** general § 371 conspiracy allegedly continued until April 2016 [DE:1].

So any loss *after* the November 16, 2015, resignation to April 2016, end of conspiracy should not be attributed to Horn.

The amount of the loss was the most important factor in determining Horn's sentence. With the court below finding an "intended loss" amount of $3,750,000 Horn received an 18-level increase [DE:233:5,18] [DE:160:¶64].

Only 4 alleged victims testified so any "loss amount" should be limited to these four victims. FBI Agent Palomares testified he phoned several Sunset investors [DE:229:181-83]. But this "phone survey" was far short of the 1,000-plus investors in Sunset.

In *United States v. Gonzalez*, 611 F. App'x 619, 630 (11th Cir. 2015), this Court held:

> Although Defendants on appeal complain that only five taxpayer-victims testified the district court did not rely on this trial evidence to apply the victim enhancement. Instead, the district court based its finding there were 165 victims on Agent Munoz's testimony at sentencing that 165 individuals had advised the IRS that Luxury Tax had used their personal information without permission to file fraudulent tax returns.

The *Gonzalez* Court held the district court's findings on the number of victims was supported by sufficient evidence of contact with all victims and affirmed.

But the facts at bar are different. Not one Sunset investor filed a complaint with any law enforcement or regulatory agency. The few investors who were contacted by the FBI did not complain of any fraud by Sunset. Virtually all Sunset investors still had the shares they bought, which was still publicly traded even now.

This does not represent that (1) outright fraud perpetrated by Horn on victims, or (2) *every* victim was contacted in the determination of loss as in *Gonzalez*, *supra.*

Horn acknowledges this Court has previously held every investor need not be contacted directly by the government, for that victim's loss to be included in the total in *Stein*, *supra.* But that presupposes a fraud where nothing of value is produced by the defendant(s), and no intervening events affecting loss, unlike the facts at bar.

The vast majority of the over 1,000 Sunset investors were *not* contacted by the FBI [DE:230:20-21]. The PSR and government used (and the court below

adopted) the theory the "intended loss" should be determined by the total shares sold, multiplied by the total money paid by investors [DE:160:¶64] [DE:233:5, 18].

This formula is flawed. It's not like Sunset was selling shares in a unicorn farm. Sunset stock had *actual value* reflected in its listing since it was publicly traded since 2012 [DE:230:25]. This actual value should be credited to any "loss" and any *profit* made by the sale of Sunset stock.

## B. Sunset stock had value

Sunset CEO Speck went through the process of getting his stocks unrestricted and sold 60,000 shares of Sunset stock for $60,000 [DE:228:77]. Speck received 150,000 restricted shares of Sunset stock instead of salary [DE:228:46]. Speck believed Sunset's assets were estimated at $700,000,000 [DE:228:39].

Klimczak testified the Sunset price per share was $.56, and then $.75 per share; it reached $1.05 per share [DE:229:47, 161].

FBI Agent Palomares also testified Sunset stock had value [DE:230:22]. But the court below did not credit this against Horn's loss amount. Alleged victim Caruso testified he *still* owned Sunset stocks as of the time of his trial testimony [DE:230:155].

Alleged victim Wetch testified he *still* had the 20,000 Sunset shares he bought, but did not know the value of the shares [DE:230:101]. Investors who still own Sunset stock should not be included in the "loss amount". Sunset corporate

executives were paid in Sunset stock [DE:229:193]. Olund, when merging Sunset with Aphex, had his income deferred since he owned 24,000,000 shares of Sunset [DE:231:82].

When considering the loss caused by fraudulent conduct, the nature of the individual scheme must determine the correct way to measure the loss. *United States v. Woodard*, 459 F.3d 1078, 1087 (11th Cir. 2006); *United States v. Orton*, 73 F.3d 331, 333 (11th Cir. 1996). Horn's court erred in not finding Sunset stock had value per *Woodard, supra.*

### C. Virtually none of the investors ever tried to go through the process to get their Sunset stock "unrestricted" or sell it

Alleged victim Wetch testified he never got his stock unrestricted to sell them [DE:230:103-04]. Alleged victim Olerud similarly testified he never got his shares unrestricted so he could sell them [DE:231:49].

Should these stocks be considered a loss attributable to Horn? There was no evidence adduced showing a shareholder went through the process to get the stock unrestricted, and could not sell it.

### D. One Sunset investor (Horn's dad) got his Sunset stock "unrestricted", sold it, and made a $30k profit on his $50k stock purchase

If other Sunset shareholders did the same, they could have made a profit.

**E. Because Sunset stock had value, the "loss" amount is not simply a matter of multiplying funds paid by investors by number of stocks bought**

The court below used this "buyers only" formula to calculate loss. But because Sunset stock had value, and Horn's conduct was not permeated with fraud, the court erred in reaching the $3,750,000 "intended loss" amount.

"'Where, as here, a defendant's conduct was permeated with fraud, a district court does not err by treating the amount that was transferred from the victim[s] to the fraudulent enterprise as the starting point for calculating the victim[s'] pecuniary harm.'" *United States v. Foster*, 878 F.3d 1297, 1306 (11th Cir. 2018) (quoting *United States v. Campbell*, 765 F.3d 1291, 1302 (11th Cir. 2014)).

Since Horn's conduct was not permeated with fraud, the court below erred by treating the amount of funds transferred from the alleged victims to Sunset as the starting point for calculating the victims' financial harm.

Because Sunset stock had value, its dollar value must be credited against any loss. 'This approach recognizes that "the offender who transfers something of value to the victim(s) generally is committing a less serious offense than an offender who does not.'" *Foster, supra,* 878 F.3d at 1306 (11th Cir. 2018) (quoting *Campbell*, 765 F.3d at 1302) (holding defendant did not provide value to investors).

But Sunset stock value was *not* considered by the court below, resulting in error in its loss determination per *Foster, supra*.

**F. "Intended loss" amount is not reasonably foreseeable to Horn, so he should not be held responsible for it**

### i. Horn was duped by Watson, Jr., into believing Sunset was a legitimate business

Horn was deceived as much as the Sunset President, CEO, CFO, CPA and attorney, and anyone else who relied on the Watsons' representations regarding its assets, procedures in selling of stocks, investment in Sunset of the investors' funds, etc. [DE:233:35].

### ii. Horn left Sunset on Nov. 16, 2015, so subsequent "loss" should not be attributed to him

Horn voluntarily absented himself, and communicated this to the leader of the organization. It is reasonable to infer Watson, Jr., would communicate Horn's withdrawal to the other executives and employees at Sunset. This is shown by Horn receiving no paychecks after November 16, 2015 [DE:229:134, 136].

**G. Any purchase of stock has risks involved, so "no profit" does not equal fraud**

Agent Palomares testified financial statements for over-the-counter stocks like Sunset are not audited by accounting firms; investors invest in over-the-counter stocks or penny stocks because they can provide a much higher return on investments [DE:229:196].

Sunset President Betros testified the interests offered by Sunset involved a high degree of risk [DE:228:237].

Alleged victim Wetch testified that with any stock there are risks [DE:230:95]. Alleged victim Caruso also testified there are risks involved with stock purchases [DE:230:153]. So the alleged victims who testified at trial assumed the risks of stock purchases (as did the other Sunset investors).

Loss does not equal fraud.

## H. Horn was only given $182k total (out of which he was directed to pay employees);  only $25k went to Horn personally

So he earned about $8.50/hour.

## Argument IV

### The court below erred at the restitution hearing when it made the finding the "actual loss" amount was $1,469,702

At the hearing per the Mandatory Victims Restitution Act of 1996 ("MVRA"), 18 U.S.C. § 3663A, and U.S.S.G.§ 2B1.1, to determine "actual loss", Horn objected to the government's assertion the restitution amount was $1,469,702 (total amount of actual sales of Sunset stock) [DE:238:3, 6-7,10-11].

The government claimed the Sunset stock was worthless [DE:238:5,23]. The court below denied Horn's objection, and found the restitution amount was $1,469,702 [DE238:26].

Horn properly preserved his objections to the manner and "buyers only" procedure used by the court below and its findings in the "intended loss" amount of $3,750,000 at sentencing [DE:233:43], and the "actual loss" amount of $1,469,702 at the subsequent restitution hearing [DE:238:27]. *See United States v. Abovyan*, 988 F.3d 1288, 1312 (11th Cir. 2021) (holding Abovyan waived these arguments because he did not object to the amount of the intended loss in the PSI or its foreseeability but repeatedly told the court he challenged only the use of intended instead of actual loss).

The Horn prosecutor and sentencing court used the same inaccurate "buyers only" theory in determining (1) the "actual loss" restitution amount, and (2) the "intended loss" amount [DE:238:5, 26]. The prosecutor defined the "buyers only" theory when he stated where victims hold shares of worthless stock they purchased in a securities fraud, the price the victims paid for stock is a reasonable measure of their loss [DE:238:5].

The court adopted the "buyers only" theory in determining restitution amount [DE:238:25-26]. No credit was given for actual value of stock, profits made from sales of stock, intervening events unforeseeable to Horn which affect value of stock, etc.

Horn incorporates by reference his prior arguments herein regarding the proper procedure to determine "intended loss".

This Court's recent precedent supports Horn's position. In *United States v. Ballesteros-Garcia*, No. 16-11741, 2023 U.S. App. LEXIS 5743, at *8 (11th Cir. Mar. 10, 2023), the defendant was involved with a fraudulent mortgage transaction.

The *Ballesteros* Court thoroughly lays out the loss amount calculation for fraudulent mortgage transactions ("actual loss" is amount of loan minus amount recovered from collateral property's sale). *Id.* at *9. The *Ballesteros* Court held the district court did not clearly err in determining loss amount.

But Horn's court did *not* engage in this *Ballesteros* calculation for loss amount (e.g. *no credit* for the *value* of Sunset stock, applied to any loss by investors). So the court below erred in its loss calculations per *Ballesteros*.

The Sunset stock had value. The investors got the shares of stock they paid for. Any purchase of stock has risks of the value of the stock fluctuating. There were intervening events not reasonably foreseeable to Horn. So the court below cannot simply take the money *actually paid* by investors as the restitution amount.

This results in unjust enrichment for Sunset investors. They can *keep* the actual Sunset stock they have, sell it, or use it as collateral, etc. But they also get the added benefit of getting restitution for that *same stock* from Horn. Restitution assumes a loss to be recompensed. *Abovyan*, *supra,* 988 F.3d at 1312.

If the court below used its $1,469,702 restitution/"actual loss" finding for its sentence, there would have been only a 14-level increase. But the $3,750,000 "intended loss" figure which the court used for its sentence has an 18-level increase.

So this 4-level difference in calculating loss is the difference between a Total Offense level 37 (210-262 months), versus a Total Offense level 33 (135-168 months).

## Argument V

**The court below erred when it made the finding Horn was an (i) "officer" or (ii) "director" of a publicly-traded company, (iii) "broker" or person associated with a broker or dealer, or (iv) "investment advisor" or person associated with an investment advisor**

Horn asserts the court below also erred at sentencing when it overruled the above Horn objection without comment and gave him a 4-level enhancement per U.S.S.G. § 2B1.1(b)(20)(A). [DE:233:11-12, 18, 43] [DE:160:¶67].

Because of the court's general denial of Horn's objection, the record is not clear as to *which* of the 4 titles the court found to apply the enhancement. This Court should remand this issue for a resentencing hearing to clarify this ruling. Horn asserts he fits *none* of the three roles outlined in the enhancement.

Horn was simply an administrative assistant who did ministerial tasks when told by Watson, Jr. While Horn had been a licensed security broker with a Series 7

license for a year in 1990, he let it lapse *over 20 years before* he began working at Sunset [DE:160:¶27].

A review of the Commentary note to 18 USCS Appx §2B1.1 defines the key terms used in this enhancement. See Note 16 Application of Subsection (b)(20). - (A) Definitions.

Horn asserts he meets *none* of the definitions of these terms describing "brokers" and "investment advisors", etc., and should not have received this 4-level enhancement. At the very least, this specific item should be remanded for a resentencing so the court below can specify for which of the 4 titles it gave this enhancement.

**Argument VI**

**The court below erred when it made the finding of "10 or more victims"**

At the sentencing hearing, Horn objected to the PSR and government's assertion there were "10 or more victims". But the court below gave him this 2-level enhancement per U.S.S.G. §2B1.1(b)(1)(A)(i) [DE:182:9] [DE:233:11] [DE:160:¶65].

But the court below overruled that objection without comment [DE:233:18]. Horn *still* has no idea how the court determined the number of alleged victims to give the 2-level enhancement. The court again accepted the government's general "buyer's only" method of calculating loss. This means *any* person who invested in Sunset shares was a "victim". Even the ones *who made money* selling Sunset shares.

Horn's counsel objected to the manner and procedure of the denial of his objection to this 2-level enhancement [DE:233:43]. This issue should be remanded for a resentencing hearing for the court to state on the record its fact-finding regarding number of victims.

**Argument VII**

**Cumulative error by the court below and government denied Horn his constitutional due process right to a fair trial**

### A. The court below erred when it did not allow counsel for Horn to argue the affirmative defense of a violation of the Statute of Limitations ("SOL")

#### i. The facts in the record supported an SOL defense

Arnold Horn, Appellant Horn's father, testified in the defense case about facts of Horn's withdrawal from the alleged conspiracies [DE:231:106-120]. The FBI Agent testified Horn had no further contact with his alleged co-conspirators or received payments after November 16, 2015 [DE:229:134, 136].

The relevant SOL for the Horn charges are 5 years (Count 1 § 1349 conspiracy, and Count 2 § 371 conspiracy) or 6 years (Counts 3-7 15 U.S.C. §§ 77q(a) and 77x securities fraud ). Because his last act was November 16, 2015, the 5-year SOL expired on Count 1 and Count 2 on November 16, 2020 (2 months and 3 days *before* the January 21, 2021 *Indictment* was filed [DE:1]. The Count 1 conspiracy had the highest penalty (20-year maximum); the remaining Counts each had a maximum sentence of 5 years.

## ii. The court below abused its discretion by not stopping trial, fashioning an SOL jury instruction, instructing the jury on the elements of an SOL absolute defense, and permitting Horn's attorney to argue it

The facts for Horn to argue the SOL absolute defense were in the record. Horn left Sunset after he confronted Watson, Jr. about misrepresentations regarding Sunset's activities he made to Horn [DE:233:10]. The government agreed after receiving his last check on November 16, 2015, Horn was no longer at Sunset [DE:229:134, 136]. The *Indictment* in this case was filed on January 19, 2021 (5 years, 2 months, 3 days after Horn's last acts at Sunset) [DE:1].

This Court has defined the elements of the withdrawal from the conspiracy defense:

> 'To establish the affirmative defense of a withdrawal from the conspiracy, the defendant has the substantial burden of proving: (1) that he has taken affirmative steps, inconsistent with the objectives of the conspiracy, to disavow or to defeat the objectives of the conspiracy; and (2) that he made a reasonable effort to communicate

those acts to his co-conspirators or that he disclosed the scheme to law enforcement authorities.'

*United States. v. Schlei*, 122 F.3d 944, 969-70 (11th Cir. 1997) (quoting *United States v. Starrett,* 55 F.3d 1525, 1550 (11th Cir.1995)).

Directly confronting Watson, Jr., and immediately severing all ties with Sunset make a *prima facia* case for withdrawal from the conspiracy, triggering the SOL defense. So the court erred by depriving Horn of this absolute defense.

## B. Horn's 5th Amendment right not to incriminate himself was violated by FBI Agent Palomares' testimony, "I tried to get an in-person interview with Horn but was unsuccessful"

FBI Agent Palomares' above testimony about an unsuccessful attempt to interview Horn was highly prejudicial to Horn [DE:229:162]. Its prejudicial effect outweighed its probative value per Fed. R. Ev. 403.

In *Montejo v. Louisiana*, 556 U.S. 778, 795 (2009), the Supreme Court articulated the overarching effect of the Fifth and Sixth Amendment and repeated the *Miranda-Edward* regime protects a defendant's right to silence. The *Montejo* Court held in part when a defendant is not in custody, he is in control, and need only shut his door or walk away to avoid police badgering. *Id.* at 795.

So Horn not only had the right to remain silent in response to any of Palomares' questions, but also had the right to walk away per *Montejo.*

### i. Creates inference Horn avoided interview

The very mention of Agent Palomares' failed attempt to interview casts Horn in a bad light. Jurors could easily speculate Horn took evasive actions to *avoid* the interview.

### ii. Gives false impression of "consciousness of guilt"

Why would Horn avoid an interview? Jurors could easily infer Horn knew he was guilty of fraud, and did not want to explain himself to the FBI. This is inaccurate on either count, and is highly prejudicial.

In *United States v. Hipps*, 857 F. App'x 1002, 2021 WL 2026666 (11th Cir. 2021), this Court reversed the mail fraud and false statement conviction based on an agent interviewing Hipps three times, and testifying he thought Hipps was lying in the interviews. *Id*. at 1007-09. The *Hipps* Court found plain error in letting the jury hear the opinion of the agent on the credibility of defendant Hipps.

The *Hipps* Court opined a witness may not testify on another witness's credibility under the guise of explaining investigative steps "as an indirect way of bolstering . . . or attacking" the credibility of another witness. *Id.* at 1009 (citing *United States v. Henderson*, 409 F.3d 1293, 1299 (11th Cir. 2005)); *see* Fed. R. Evid. 608(a).

This is how FBI Agent Palomares testified at Horn's trial. He made the gratuitous remark of explaining his investigative step to interview Horn.

This negatively attacks the credibility of Horn, and creates an aura of consciousness of guilt by Horn. This violates the spirit of *Hipps* and is plain error, and the same result should lie (i.e. reversal of conviction).

### iii. Horn is prejudiced because he had no legal recourse to correct this perception of "consciousness of guilt"

This is especially true when Horn does not testify. All because an agent did not conduct an interview, but testified about the "non-interview".

## C. Horn's Fifth Amendment right not to testify was prejudiced by FBI Agent Palomares' testimony regarding Horn avoiding an interview, an indirect comment on Horn's failure to testify at trial

### i. Horn not testifying, plus "not giving an interview", *highlights* Horn's exercising his right not to testify at trial

This is a deadly combination which leads to his 5th Amendment right against self-incrimination being violated. It is difficult to explain to a jury why, if a man is innocent, he does not testify and say so. That the jury had evidence of a *second* occasion where Horn did not protest his innocence is extremely prejudicial.

### ii. This combination violates his 5th Amendment right against self-incrimination at an interview, and right to not testify

This Court has consistently held an individual has the right not to answer specific questions during an interrogation. *United States v. Thomas*, 176 F. App'x 997, 997 (11th Cir. 2006); *see United States v. Mikell* 102 F.3d 470 (11th Cir. 1996).

But Horn's right not to answer specific questions during an interrogation was violated here.

## D. The court below erred by allowing evidence that Horn did not file a tax return(s) during the alleged conspiracy

### i. This evidence is not relevant

The government introduced evidence over defense objection Horn did not file his personal tax return for the years of the alleged conspiracy [DE:229:4-5]. The government claimed it was probative of consciousness of guilt. This was prejudicial to Horn.

What does evidence of failure to file a tax return(s) prove regarding Horn's alleged *attempt to defraud investors*? Nothing.

### ii. Horn's failure to file his personal tax return is more prejudicial than probative

Federal Rule of Evidence 403 states in part:

The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of: unfair prejudice, confusing the issues, misleading the jury….

The probative value of Horn not filing a tax return is speculative. But the unfair prejudice of allegedly not paying Horn's fair share of taxes is clear.

In *Old Chief v. United States*, 519 U.S. 172, 191 (1997), the Supreme Court found the district court abused its discretion in admitting defendant's record of

conviction because its discounted probative value was substantially outweighed by the risk of unfair prejudice. That analysis shows unfair prejudice to Horn.

### iii.  Many legitimate reasons a tax return might not be filed

Horn filed for an extension of time with the IRS to file his tax return(s). For IRS purposes, such a return is not "late".

Any delay is  still not probative of whether Horn had the requisite *mens rea* to defraud Sunset investors.

### E. The court below erred by letting a government witness testify as an "expert" without the government previously giving notice to defendants

The court allowed the government witness Melley to testify as an expert in securities law as a Director of Financial Industry Regulatory Authority ("FINRA") [DE:227:175, 184-205]. Horn's counsel objected because of no prior notice of an expert witness [DE:227:184-205].

Melley testified about:  (1) obligations of brokers to customers during phone solicitations, (2) registered representatives required to disclose commissions, (3) who can buy and sell securities on behalf of clients, (4) licensing requirements for brokers, etc. [DE:227:194-96].

### i. Horn was prejudiced because he could neither prepare for an "expert witness" nor obtain a defense expert to counter the government expert

Fed. R. Crim. P. 16(a)(1)(G) requires the government to timely reveal a complete statement of the expert's opinion, the basis and reasons for them, the witness's qualifications, and a list of all other cases within the previous 4 years that the witness has testified as an expert at trial or by deposition.

The defendant must prove "a likelihood that the verdict would have been different had the government complied with the discovery rules." *United States v. Holland*, 223 F. App'x 891, 895 (11th Cir. 2007). A conviction likely will not be reversed "based on a Rule 16 expert disclosure violation unless the violation prejudiced the defendant's substantial rights." *Chalker*, 966 F.3d at 1192.

The *Holland* Court further opined "[a]lthough Holland contends that a more thorough disclosure by the government would have allowed him to prepare a rebuttal witness to refute Taylor, we 'fail to see how a defense expert could have refuted' what was testimony of an 'obvious' nature." *Id.* at 895.

At bar, Horn could have had a defense expert which could have (1) refuted the government's expert's testimony, and (2) helped his counsel prepare questions for cross-examination of the government's expert, the FBI Agent, Sunset executives, and stock purchasers regarding Horn's requirements in his limited role.

So he meets the *Holland* test.

## CONCLUSION

Appellant Horn respectfully requests this Court to (a) reverse his conviction, or (b) remand the case for a re-sentencing hearing with instructions to use actual loss for sentencing, make specific findings of fact for "intended loss", "actual loss", "organizer or leader", "officer in publicly-traded company", "10 or more victims", or (c) any other relief the Court considers appropriate.

Respectfully submitted,

s/Michael Hursey
MICHAEL HURSEY, Esq.
Counsel for Appellant Horn
5220 S. University Dr., C-110
Ft. Lauderdale, FL 33328
Telephone:(954) 252-7458
Fax:   (754) 551-6574
FL Bar No. 457698
Email:mhpalaw@bellsouth.net


## CERTIFICATE OF SERVICE

I certify this *Initial Brief* was efiled with the Clerk of Court and sent via CM/ECF this 20th day of September, 2023.

s/Michael Hursey
MICHAEL HURSEY, Esq.