[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-13327

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

JEFFREY ALAN HORN,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:21-cr-60019-RS-3

_____

Before WILLIAM PRYOR, Chief Judge, and JORDAN, and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

In April 2022, a jury convicted Jeffrey Horn, a former registered stockbroker, of conspiracy to commit mail and wire fraud, conspiracy to commit securities fraud, and securities fraud. The district court sentenced him to a term of 100 months in prison, followed by a three-year term of supervised release, along with a $600 special assessment and the requirement that he was jointly and severally liable to make restitution to the victims of the fraud in the amount of $1,469,702. Horn appeals his convictions for sufficiency of the evidence and cumulative error, and he raises various objections regarding the calculation of his loss, restitution, and offense level under the Sentencing Guidelines. After careful review, we affirm the judgment of the district court in full.

## I.

Sunset Capital Assets ("Sunset") was a publicly traded company, traded as a penny stock in the "over the counter" ("OTC") market. Penny stocks are stocks that trade under five dollars. Because there usually are not many buyers and sellers for penny stocks, and because there is not much information regarding companies considered to be penny stocks, the OTC market is considered a "buyer beware" marketplace.

Sometime around 2010, John Bert Watson, Sr. and John Bert Watson, Jr. purchased Sunset. Through their purchase, the Watsons intended either to start a company or acquire companies by

raising capital.  The Watsons appointed a president, CEO, and CFO to the company.  However, these individuals were not involved much with the company.  Allen Speck, the CEO, testified that he had a full-time job in another state, visited Sunset's offices only once, and his sole interaction with the company was signing quarterly OTC disclosure statements, which he did not check because he trusted that the disclosure was correct and had been done by an accountant.  Cynthia Delaparte, the CFO, testified that although she would check the books on a quarterly basis, "it wasn't a very busy time," and Sunset had very little assets, expenses, or cash flow up until 2014.  As a result, Sunset's officers were almost entirely unpaid.

In 2014, the Watsons began issuing restricted Sunset stock shares.  The Watsons made this decision without consulting Speck, Sunset's officers, or the Board of Directors, even though the Watsons falsified records stating that they had.  The Watsons issued 3 million restricted shares through a Regulation D private placement, meaning that the shares were unregistered securities offered to a limited number of individuals and could not be sold right away.  Stockholders were required to hold the shares for a certain amount of time, and then could go through a process with a third-party agent to "unrestrict" the stock before selling it.  Alternatively, the stock would automatically become unrestricted after seven years.

The Watsons hired the appellant, Jeffrey Horn, to sell the shares.  Horn previously was a licensed stockbroker, having taken and passed both the Financial Industry Regulatory Authority

("FINRA") Series 7 exam and a companion Series 63 state examination in 1999. Horn recruited several sales people to call investors, set up at least one call center, and paid rent for it and for three other call centers. Horn also directly communicated with an investor who testified at trial, Stanley Wetch, to convince him to buy Sunset shares.

The Watsons also prepared several versions of a Private Placement Memorandum ("PPM") and a sales presentation, both of which Horn distributed to investors. The PPM and sales presentation included numerous materially false statements. Thus, for example, the PPM claimed that Sunset had over $570 million in assets and a "number of fine art, antiquities, and hard assets," with market values that had been fairly determined by the company. Similarly, the sales presentation assured the investors that "Sunset is well capitalized with assets exceeding $812M" and that "Lloyds [*sic*] Associates" had appraised gemstones held by Sunset at over $1.2 billion in "Combined Replacement Value" and more than $800 million in "Combined Fair Market Value." The presentation further projected the company's year-end revenue for 2015 to be over $100 million, and attributed to Speck statements praising Sunset for hitting "a significant milestone" in an "effort to strengthen our already solid foundation."

In reality, Sunset had almost no assets or cash flow at all, and CEO Speck testified he never made any of the statements attributed to him in the marketing materials. Notably, the gemstones did not belong to Sunset, many of them had never been

appraised by Lloyd Associates, and the individual who appraised them determined that some of them were fake. In fact, the gemstones were not even owned by the Watsons. Rather, the gemstones were assigned to the Watsons for the purpose of splitting the proceeds if the Watsons were ever able to sell them. Watsons enlisted David Olund to help sell the gemstones, but after Olund spent about $80,000 and two years to investigate the history of the assets, he ultimately concluded he could not assign a value to the gemstones. Nonetheless, the Watsons prepared an "artifact history brief" assigning value to the gemstones -- ranging from $25,000 to $100,000 per carat -- and signed Olund's name to it.

The PPM included still more materially false statements. For example, the PPM assured investors that the proceeds of the stock sales would be reinvested in the company as "working capital," as well as to pay the "legal and accounting cost[s] associated with a number of mergers being contemplated." But in several emails, the Watsons agreed to distribute more than half of the proceeds directly to Horn and his fellow sales people. In fact, Horn received 22.5% of the sales proceeds through his company, Genesis Holdings, LLC ("Genesis").

In late 2014, the Sunset sales people began to cold-call victims to convince them to invest in Sunset. One victim, Stanley Wetch, testified at trial that Sunset's sales people "were really pushing to put all of your money in it," but at no point did Horn or any other sales person disclose where the money was going. Horn also emailed Wetch a non-disclosure statement and a subscription

agreement.  The subscription agreement included a certification that the victim (Wetch) was an "accredited investor," which federal law defines, among other things, as an organization or individual with a household net worth of over $1 million, excluding primary residence.  Notably, however, Wetch was not an accredited investor, and he had a net worth of only around $100,000.  When Wetch went over his net worth with Horn, Horn "said don't worry about it" and "just minimized" the requirement.  In fact, Wetch had no recollection of anyone at Sunset ever asking him what his income was.  The subscription agreement also falsely represented that the stock sale did not include a broker's fee or finder's fee when, in fact, nearly half of the proceeds were paid to Horn and the other sales people.

The testimony at trial of other victims was similar.  Although Horn did not speak directly on the phone with the other victims who testified, he sent follow-up emails to them with the PPM and sales presentation.  Douglas Caruso, an electrician with "[v]ery, very limited" investment experience, testified that he "[a]bsolutely read" the documents Horn sent him and relied upon them when deciding to buy stock.  Like Wetch, Caruso also received a subscription agreement confirming that he was an accredited investor, and like Wetch, Caruso was not.  Moreover, Caruso did not have a household net worth of over $1 million.

In all, Horn and his sales people raised more than $1.6 million from investors, almost all of which went into three bank accounts controlled by the Watsons.  Horn received some $182,000

of that investor money from the Watsons, in addition to about $55,000 in other deposits.  With that money, Horn paid himself $25,900, paid five other Sunset sales people, and spent $172,688 on plane tickets, rental cars, hotels, retail purchases, as well as perfume, flowers, women's apparel, and tanning salon visits.

Horn received his last check from Sunset in November 2015.  Soon after, Horn lost all communication with Sunset.  The company stopped answering Horn's phone calls, emails, and messages, and Horn stopped working at Sunset.

In 2020, the Watsons sold Sunset to a company called Aphex Biocleanse Systems through a share exchange, which in essence diluted Sunset's shareholders from owning 100% of the company to owning just 10%.  Sunset's 2017 annual disclosure statement, filed retroactively in 2020 for the purpose of the sale, stated that Sunset "acquired a number of fine art, antiquities, and hard assets in exchange for stock" but that "it was determined that these assets which had been invested in good faith had been lost" despite "reasonable efforts . . . to attempt to recover the assets."  Sunset reported that its Board agreed that the net value of the assets was now zero, and in subsequent annual reports, the assets remained zero.  Although a few Sunset shareholders, including Horn's father, were able to sell their shares in the years following the scheme, the stock is currently worth almost nothing.

On January 19, 2021, after an extensive FBI investigation, a grand jury sitting in the Southern District of Florida returned an indictment charging the Watsons, Horn, and Omar Leon

Plummer, a sales person supervised by Horn, with conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349 (Count 1), conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371 (Count 2), and five counts of securities fraud, in violation of 15 U.S.C. §§ 77q(a) and 77x and 18 U.S.C. § 2 (Counts 3–7). On April 11, 2022, Horn and Plummer proceeded to trial.[1] The district court later dismissed Count 3 for reasons not contested or at issue in this appeal. After only some four hours of deliberation, the jury returned a verdict convicting Horn on all counts and convicting Plummer on Count 2.

The district court sentenced Horn to 100 months in prison for Count 1 and 60 months in prison as to the other counts, all terms to run concurrently, followed by three years of supervised release. The court also imposed a $600 special assessment. At the restitution hearing, the court found that "by a preponderance of the evidence . . . these defendants [Horn and Plummer] are responsible for the entire amount jointly and severally $1,469,702 as restitution."

This timely appeal by Horn followed.[2]

---

[1] The Watsons did not go to trial. Watson, Sr. had died, and Watson, Jr. was a fugitive, having fled the United States, and is believed to be living in Nicaragua.

[2] The district court sentenced Plummer to 36 months in prison, followed by three years of supervised release. The court also imposed a $100 special assessment, and it found him jointly and severally liable for the restitutionary amount of $1,469,702.

II.

A.

Horn raises several arguments challenging the sufficiency of the evidence. We begin with Horn's claim that the evidence was insufficient to establish that he acted "willfully." Horn says that several pieces of evidence at trial show that he was innocently duped into fraudulently selling Sunset shares and therefore, the jury could not convict him of anything. We remain unpersuaded.

We review the sufficiency of the evidence *de novo*. *United States v. Doe*, 661 F.3d 550, 560 (11th Cir. 2011). In so doing, the Court must "view the evidence in the light most favorable to the government and resolve all reasonable inferences and credibility evaluations in favor of the jury's verdict." *Id.* (quoting *United States v. Robertson*, 493 F.3d 1322, 1329 (11th Cir. 2007)). "Evidence is sufficient to support a conviction if 'a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt.'" *United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009) (quoting *United States v. Calhoon*, 97 F.3d 518, 523 (11th Cir. 1996)). The "evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *Doe*, 661 F.3d at 560 (quoting *Robertson*, 493 F.3d at 1329).

Proof of intent to defraud is necessary to support a finding of "willfulness" for securities and wire fraud. *United States v. Bradley*, 644 F.3d 1213, 1239 (11th Cir. 2011); *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1299 (11th Cir. 2011). "To gauge a defendant's intent to commit a fraudulent scheme," a jury "must

determine whether the defendant attempted to obtain, by decep-
tive means, something to which he was not entitled." *Bradley*, 644
F.3d at 1240. "A jury may infer an intent to defraud from the de-
fendant's conduct." *Id.* at 1239 (quoting *Maxwell*, 579 F.3d at 1301);
*cf. United States v. Santos*, 553 U.S. 507, 521 (2008) (observing that
"knowledge must almost always be proved . . . by circumstantial
evidence.").

Taking the evidence in the light most favorable to the Gov-
ernment, a reasonable jury could readily infer (as it plainly did) that
Horn acted with the requisite intent to defraud. For starters, the
jury heard testimony from Peter J. Melley, an attorney at FINRA,
that Horn had formerly worked as a licensed stockbroker, having
passed his Series 7 and Series 63 licensing exams in 1999. The jury
also learned that passing those exams imposes upon a licensed
stockbroker the duty to fully and honestly advise his client, and the
duty to make diligent good faith efforts to obtain essential facts be-
fore making appropriate recommendations -- including finding out
what a suitable recommendation is based on the client's age, time-
line, risk tolerance, assets, liabilities, net worth, and financial so-
phistication.

Further, the jury saw copies of several emails in which Horn
distributed the PPM and sales presentation to investors. Among
other things, these materials falsely represented that the proceeds
of all sales of Sunset stock would be reinvested in Sunset itself. A
reasonable jury could infer that Horn knew this was not true, since
more than half of the proceeds of each sale were distributed

directly to Horn and the other sales people.  Moreover, Horn directed two investors to wire money directly into the bank accounts of several shell companies controlled by the Watsons.

The jury also learned that Horn emailed Wetch a copy of a subscription agreement for him to sign, falsely certifying that Wetch was an "accredited investor[]" as was required in order to participate in the private placement.  Wetch testified, however, that although he was not an accredited investor, Horn told him, "[D]on't worry about it," and "just minimized" the requirement.

These facts alone are more than enough to enable a reasonable jury to find that Horn had the requisite fraudulent intent.  A reasonable jury crediting this information readily could determine that Horn (1) knew well his duty to be honest and diligent when making sales to clients, but (2) nevertheless repeatedly sent his clients materially false information telling them that their funds would be invested completely into Sunset when, in fact, he was directing them to wire money into shell companies which would subsequently wire money into Horn's own bank accounts, and (3) convinced unsophisticated investors, who did not qualify for the private placement, to buy the stock anyway, while simultaneously certifying that they were accredited investors and downplaying the accreditation requirements.

Despite Horn's arguments, based primarily on the testimony of his father, that he was also duped by the Watsons and was an innocent victim, we are required to review the evidence in the light most favorable to the jury's verdict. *Doe*, 661 F.3d at 560.  And

as we see it, we cannot say that no reasonable jury could have found that his conduct was knowing, willful, and intentional.

Horn also argues that (1) he was only a glorified administrative assistant, (2) he believed Sunset's PPM, (3) he believed the gem and artifacts appraisal to be accurate, (4) at least some of the victims were, in fact, sophisticated or accredited investors who should have known how to check Sunset's true value for themselves, and (5) even sophisticated businessmen dealing with Sunset could not discern the ongoing fraud. However, none of this refutes the evidence establishing willfulness and, in some cases, is not even relevant. The only pieces of evidence in the record offered to establish that he was merely Watson, Jr.'s "administrative assistant" are that Horn did not personally prepare the false PPM and materials sent to victims and that one victim, Caruso, testified that Horn did not present him with anything on the phone but only forwarded him emails. But a jury could limit or disregard the significance of this evidence in favor of the testimony of, among others, Wetch, who spoke with Horn on the phone repeatedly and was instructed by Horn where to wire money, and with whom Horn directly shared the false sales presentation (even if Horn did not personally prepare the presentation).

Moreover, Horn cites no contrary evidence showing that he believed the PPM or the very large gem and artifacts appraisals. In any event, Horn was not required to know every detail of the fraud. "A single conspiracy may be found where there is a 'key man' who directs the illegal activities, while various combinations

of other people exert individual efforts towards the common goal." *United States v. Gonzalez*, 940 F.2d 1413, 1422 (11th Cir. 1991). Further, the fact that some of Sunset's victims were sophisticated or accredited investors did not relieve Horn of his responsibility to not mislead them or, in particular, to not mislead others, like Wetch and Caruso, who plainly were neither sophisticated nor wealthy. Finally, the fact that Sunset successfully concealed its fraud from several businessmen with whom it was dealing has no bearing on Horn's state of mind when Horn was on the inside of this conspiracy.

Horn also argues that the evidence was somehow insufficient to establish injury or loss as a matter of law because Sunset's investors "got what they paid for," since investors paid for a certain number of shares and received that number of shares from Sunset. Horn's argument is flatly wrong and relies on a misreading of *United States v. Takhalov*, 827 F.3d 1307 (11th Cir. 2016). In *Takhalov*, women posing as tourists lured men into the defendants' bars and clubs. *Id.* at 1310–11. Once inside, the men were persuaded to spend money on overpriced drinks. *Id.* at 1311. We held that "if someone is lured to a bar under false pretenses but nevertheless gets precisely what he pays for, he has hardly been deceive[d] or cheat[ed] out of money or property." *Id.* at 1318 (internal quotation marks omitted).

This is because if the women lied to the men about their relationship with the bar, and the men, relying on that lie,

purchased the overpriced drinks but still got what they bought, they may have been misled but there was no fraud. *Id.* at 1316–17, 1319.

The problem with Horn's theory is that the lies in this case were about the Sunset shares themselves. By misrepresenting Sunset's essential qualities -- including its assets, cash flow, and what would be done with the proceeds of the share purchases -- Horn and his co-conspirators misled investors about what investors were actually purchasing. The investors thought they were buying shares in a potentially lucrative company; instead, they got shares in a worthless shell. For this reason, we have previously rejected *Takhalov* arguments in the securities fraud context. *See United States v. Wheeler*, 16 F.4th 805, 820–21 (11th Cir. 2021) (per curiam) (finding that misrepresenting facts about a company's profits, association with a high-profile company and executive, and commissions to sales people constituted a misrepresentation of the "essential characteristics of the stock" and thus constituted fraud). Because Horn misrepresented Sunset's cash flow and its assets, he misrepresented the essential characteristics of the stock.

Even if we accepted Horn's argument that he believed the company actually had some value, the fact that Horn knew he was being paid out from the proceeds of investor purchases alone could amount to fraud, since "a reasonable jury could have found that it would decrease the value investors got from the bargain if their money was going to a salesperson's pocket in the form of commissions, rather than injecting capital for [Sunset] to expand or to

conduct research and development" as Horn represented. *Id.* at 821. Horn's *Takhalov* argument fails.

What's more, on this set of facts, the jury was not required to accept that Horn did not know that the stock was actually worthless in light of the many materially false representations he did make, and given the large role he played in setting up the call centers, hiring sales personnel to staff those centers, deceiving scores of investors, and participating in this elaborate conspiracy for more than one year. The evidence was sufficient for a jury to find beyond a reasonable doubt that Horn had the requisite fraudulent intent.

## B.

Horn also claims that cumulative errors at his trial warrant reversal. At the outset, we consider each of Horn's asserted errors one by one before we determine whether there was cumulative error. *United States v. Calderon*, 127 F.3d 1314, 1333 (11th Cir. 1997). Horn has the burden of demonstrating whether the aggregation of alleged errors affected his substantial rights and rendered the trial unfair. *United States v. Capers*, 708 F.3d 1286, 1299 (11th Cir. 2013).

Horn first says the district court erred when it did not allow him to raise an affirmative defense for a statute of limitations violation. According to Horn, he affirmatively withdrew from the conspiracy on November 16, 2015, and therefore the five-year statute of limitations on the two conspiracy counts expired in

November 2020, about two months before the indictment was returned.[3]  Horn adds that the trial court should have *sua sponte* given a statute of limitations defense instruction to the jury, and that he should have been allowed to argue about the statute of limitations at closing.  Neither argument is correct, so there was no error at all.

Our precedent is crystal clear that the statute of limitations is an affirmative defense, which a defendant must assert at trial. *United States v. Najjar*, 283 F.3d 1306, 1308 (11th Cir. 2002) (per curiam).  Horn's sole assertion of a statute of limitations defense came too late.  At the close of all of the evidence, Horn renewed his motion for judgment of acquittal, and when replying in rebuttal to the Government on the motion, Horn's counsel made a single reference to the statute of limitations.  Neither the Government nor the district court responded to it.  Horn did not request a jury instruction regarding the statute of limitations, and the court did not give one.  Later, Horn mentioned the statute of limitations in closing argument, saying, "the last check to Genesis was November 16, 2015, more than five years ahead of the date of the filing of the indictment which, in fact, violates the statute of limitations."  The Government objected, and the district court sustained the objection.

Longstanding precedent has held that raising a statute of limitations issue for the first time after the close of evidence is

---

[3] Horn does not contest the fraud charges on this basis because fraud has a six-year statute of limitations.

insufficient to raise it as an affirmative defense because "the prosecution is entitled to an opportunity . . . to introduce evidence" showing that the defendant fell within the statute. *Capone v. Aderhold*, 65 F.2d 130, 131 (5th Cir. 1933);[4] *see also Najjar*, 283 F.3d at 1308 (reaffirming the *Capone* rule). "A plea in bar raises an issue and affords the prosecution an opportunity to meet it. The ordinary motion to direct a verdict is not such a plea; it is not usually made until all the evidence is in, and after it is too late for the prosecution to offer evidence in rebuttal and in contradiction of it." *Capone*, 65 F.2d at 131. By failing to raise the defense before the close of evidence, Horn waived it.

Even if Horn had not waived the statute of limitations issue, Horn still would not be able to establish that the district court erred in failing to give a statute of limitations instruction *sua sponte*. Because Horn challenges the district court's failure to deliver a jury instruction he did not request, we review the court's failure only for plain error. *United States v. Deason*, 965 F.3d 1252, 1265 (11th Cir. 2020). We may find plain error only where "(1) there is an error; (2) that is plain or obvious; (3) affecting the defendant's substantial rights in that it was prejudicial and not harmless; and (4) that seriously affects the fairness, integrity or public reputation of the judicial proceedings." *United States v. Hall*, 314 F.3d 565, 566 (11th Cir. 2002). "The Supreme Court has instructed us that plain

---

[4] In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), we adopted as binding precedent all Fifth Circuit decisions issued before October 1, 1981. *Id.* at 1209.

error review should be exercised sparingly, and only in those circumstances in which a miscarriage of justice would otherwise result." *United States v. Rodriguez*, 398 F.3d 1291, 1298 (11th Cir. 2005) (internal quotation marks and citations omitted). Horn carries the "difficult" burden of establishing each of the four prongs. *Greer v. United States*, 141 S. Ct. 2090, 2097 (2021) (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)). He has not done so.

This is easily resolved at the first two steps of the analysis, because there is no error here at all, much less one that was "plain or obvious." *Hall*, 314 F.3d at 566. For the trial court to have even arguably had a duty to *sua sponte* provide an instruction for the statute of limitations, the evidence at trial would have had to have shown that Horn stopped participating in the conspiracy before January 19, 2016, five years before the indictment. But the conspiracy in which Horn was charged with participating continued until April 2016. Thus, Horn was required to offer evidence that he affirmatively withdrew from the conspiracy before it ended.

However, passively ceasing to participate in a conspiracy does not amount to withdrawal. Rather, "[i]t is well settled that an accused conspirator's participation in a criminal conspiracy is presumed to continue until all the objects of the conspiracy have been accomplished or until the last overt act is committed by any of the conspirators." *United States v. Finestone*, 816 F.2d 583, 589 (11th Cir. 1987). To overcome this presumption, Horn has the "substantial" burden of proving affirmative withdrawal. *Id.* We employ "a well-established, two-prong test for withdrawal": first, "the defendant

must prove that he undertook affirmative steps, inconsistent with the objects of the conspiracy, to disavow or to defeat the conspiratorial objectives," and second, the defendant must have "either communicated those acts in a manner reasonably calculated to reach his co-conspirators or disclosed the illegal scheme to law enforcement authorities." *United States v. Bergman*, 852 F.3d 1046, 1061–62 (11th Cir. 2017) (quoting *Finestone*, 816 F.2d at 589) (emphasis omitted). "A mere cessation of activity in the conspiracy is not sufficient to establish withdrawal." *Finestone*, 816 F.2d at 589.

Nothing Horn alleges, even if it were entirely believed by the jury, could amount to a withdrawal from the conspiracy as a matter of law. Although Horn argues that he "left Sunset after he confronted Watson, Jr. about misrepresentations regarding Sunset's activities he made to Horn," he cites to nothing in evidence and instead refers only to a statement made by his counsel in argument at his sentencing, which is not evidence. *United States v. Valois*, 915 F.3d 717, 726 (11th Cir. 2019) ("[S]tatements and arguments of counsel are not evidence." (quoting *United States v. Lopez*, 590 F.3d 1238, 1256 (11th Cir. 2009))). In fact, the only evidence presented at trial about Horn's exit from Sunset indicated that Sunset cut *Horn* out, not that Horn withdrew. Arnold Horn testified that his son "lost all communication with the company" when "[a]ny phone calls weren't answered, emails weren't answered, messages weren't answered. It was just over time, there was no more communication whatsoever with the company." And when asked whether there was "any doubt in your mind based on how [Horn] acted that, in fact, [Sunset] cut him off," Arnold Horn

replied, "None whatsoever." Far from there being a confrontation with Horn followed by a disavowal, the testimony the jury heard indicated that, instead, Sunset essentially hung Horn out to dry.

Horn failed to show that he took affirmative steps to disavow or defeat the conspiracy. *See United States v. Pippin*, 903 F.2d 1478, 1481–82 (11th Cir. 1990). Even under his version of events, after confronting Watson, Jr., he still collected his final paycheck from Sunset and did nothing to warn others, mitigate, or otherwise defeat the objectives of the conspiracy as to the sales in which he had already participated. Thus, even if Horn's counsel's statement that Horn confronted Watson, Jr. was evidence, which it was not, and were credited by the jury, which it was not, there was no error in the district court's failure to give a statute of limitations instruction, much less plain error when that instruction was never requested.

Horn also argues that his Fifth Amendment right to silence was violated by FBI Agent Alonzo Palomares's statement, "I tried to get an in-person interview with Horn but was unsuccessful." Horn did not object to this testimony, so again we review only for plain error. *See United States v. Frazier*, 387 F.3d 1244, 1268 n.21 (11th Cir. 2004) (en banc). Again, Horn's argument fails because there was no error.

For starters, Agent Palomares never said, "I tried to get an in-person interview with Horn but was unsuccessful" at any point during trial. The closest that Agent Palomares came to saying something along those lines appears to be the following statement,

where he summarized a telephone conversation he had with Horn
on September 22, 2020:

> A. It was a very short conversation. I started off by
> asking if he knew John Alexander Van Arem. He said
> he responded yes, I know a Lex. I asked him if he was
> familiar with Sunset Capital Assets. He said yes, he
> was familiar with the company. I attempted at that
> point [to] establish an in-person interview and we at-
> tempted to coordinate to do so.
>
> Q. When was Jeffrey Horn arrested?
>
> A. The same date as Mr. Plummer. January 27, 2021.

Taken in context, this comment is permissible. For one thing, the
conversation related by Agent Palomares was in a *pre*-arrest con-
text, which we have emphasized is different from the post-arrest
context. *See United States v. Carter*, 760 F.2d 1568, 1577 (11th Cir.
1985) ("There is no question that in certain circumstances it is per-
missible for a prosecutor to comment on a defendant's prearrest
silence.").

More importantly, Agent Palomares did not say that Horn
refused to answer any more questions; instead, he related that "I
attempted at that point [to] establish an in-person interview and we
attempted to coordinate to do so." The only possible inference the
jury could make regarding pre-arrest silence would be that the
prosecutor's next question involved Horn's arrest, not an in-person
interview. "Viewed in this light, any resulting prejudice would at

best be minimal." *Carter*, 760 F.2d at 1577. There was no error here, much less plain error.

Further, even if Horn had established error, he has not shown that any of his substantial rights were affected. *Hall*, 314 F.3d at 566. "This Circuit has held that the harmless error doctrine is applicable to unconstitutional comment on silence." *United States v. Gonzalez*, 921 F.2d 1530, 1549 (11th Cir. 1991). In *Gonzalez*, we held as harmless a comment on the defendant's silence when the testimony accounted for "only a few moments during an eight-day trial," and when "[t]he prosecutor did not focus on, nor emphasize Special Agent Eledge's response, or Gonzalez's silence," nor did the prosecution intentionally elicit the testimony or raise it again in argument. *Id.* at 1549–50. Like in *Gonzalez*, here the testimony at issue consisted of a single oblique reference during a six-day trial, and the Government did not intentionally elicit the testimony, nor did the Government emphasize, focus on, or return to Agent Palomares's testimony in any way. Agent Palomares's testimony did not violate Horn's Fifth Amendment rights.

Finally, Horn argues that the district court erred by permitting Government witness Peter Melley to testify when, according to Horn, Melley was an undisclosed expert witness. The trial court's ruling regarding the admissibility of lay or expert testimony is an evidentiary decision reviewed for clear abuse of discretion. *United States v. Jeri*, 869 F.3d 1247, 1265 (11th Cir. 2017). There was no abuse of discretion because Melley did not testify as an expert witness.

Federal Rules of Evidence 701 and 702 govern the boundary between lay and expert witnesses.  Fed. R. Evid. 701; Fed. R. Evid. 702.  Under Rule 701, a witness who is not testifying as an expert may offer opinions limited only to those rationally based on his own perception and not based on scientific, technical, or specialized knowledge.  Fed. R. Evid. 701.  An expert witness, on the other hand, may testify in the form of an opinion based upon the application of the expert's scientific, technical, or other specialized knowledge.  Fed. R. Evid. 702.  If a witness will offer expert testimony, Federal Rule of Criminal Procedure 16 requires timely disclosure before trial of that expert, his testimony, and what opinions he will make, so as to "provide a fair opportunity for the defendant to meet the government's evidence."  Fed. R. Crim. P. 16(a)(1)(G).  However, "[j]ust because [a witness]'s position and experience *could* have qualified him for expert witness status does not mean that any testimony he gives at trial is considered 'expert testimony.'"  *United States v. LeCroy*, 441 F.3d 914, 927 (11th Cir. 2006).  If a witness who *could* be an expert nevertheless offers only "layperson observations" and does "not provide expert testimony under Rule 702," then "no Rule 16 notice [is] required."  *Id.*

Although Melley was qualified to be an expert witness should the Government have chosen to qualify him, none of the testimony he offered crossed into the realm of Rule 702.  At trial, Melley explained the nature of his employment at FINRA and FINRA's role in regulating and licensing stockbrokers.  Melley also authenticated FINRA records establishing that Horn passed his Series 7 and Series 63 exams to become a licensed stockbroker.

Finally, Melley gave a basic overview of what was tested on those exams, including the definitions of securities, private placements, penny stocks, and the disclosure and ethical obligations of securities brokers.  Melley offered no opinions on facts or issues at trial.

Testimony like Melley's -- in which the witness is "testifying based on particularized knowledge gained from their own personal experiences" or professional background, or presenting hard facts -- does not generally rise to the level of expert opinion. *Jeri*, 869 F.3d at 1265–66 (quoting *United States v. Hill*, 643 F.3d 807, 841 (11th Cir. 2011)).  Consistent with this rule, we've held that no expert disclosure was necessary under Rule 16 where, for example: the witness provided the jury with a summary of the defendant's bank and wage records, but did not opine on them, *United States v. Chalker*, 966 F.3d 1177, 1192 (11th Cir. 2020); the witness "explained how cell phone towers record 'pings' from each cell phone number and how he mapped the cell phone tower locations for each phone call" in certain exhibits, *United States v. Ransfer*, 749 F.3d 914, 937–38 (11th Cir 2014); and the witness reviewed accounting records and explained how he calculated a summary, *United States v. Hamaker*, 455 F.3d 1316, 1331–32 (11th Cir. 2006).

Just like in those cases, Melley neutrally authenticated records indicating that Horn had passed his certification exams and explained from his own experience what is tested on those exams. "The problem for [Horn] is that he points to no opinion testimony offered by [Melley] that impermissibly crossed over the line into expert testimony.  He does not, because he cannot -- [Melley] never

opined as an expert." *Chalker*, 966 F.3d at 1192. The district court did not abuse its discretion in permitting Melley to testify and there was no error.

In short, Horn has identified no errors at all, let alone cumulative errors requiring that his conviction be overturned.

### III.

Horn also argues that the district court erred at sentencing when it increased his offense levels for various reasons. Each of Horn's arguments fails, and we take each challenge in turn.

### A.

We begin with the district court's increase of Horn's offense level by 4 levels under U.S.S.G. § 3B1.1(a) after finding that he was an "organizer" or "leader." We review the district court's determination that a defendant is subject to a Section 3B1.1 role enhancement as a leader or organizer for clear error. *United States v. Martinez*, 584 F.3d 1022, 1025 (11th Cir. 2009). Here, the district court did not clearly err, because the evidence at trial supported the district court's conclusion.

Pursuant to Section 3B1.1(a), a district court must increase a defendant's offense level by four levels "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). In considering who is a leader or organizer, titles are not controlling; rather, we consider the following factors:

> [(1)] the exercise of decision making authority, [(2)] the nature of participation in the commission of the offense, [(3)] the recruitment of accomplices, [(4)] the claimed right to a larger share of the fruits of the crime, [(5)] the degree of participation in planning or organizing the offense, [(6)] the nature and scope of the illegal activity, and [(7)] the degree of control and authority exercised over others.

*United States v. Grushko*, 50 F.4th 1, 16 (11th Cir. 2022) (quoting U.S.S.G. § 3B1.1 cmt. n.4). There is no requirement that all of these factors must be present. *Id.* Rather, we've been clear that "these factors are merely considerations for the sentencing judge, who makes the factual determinations for the applicability of the § 3B1.1 enhancement on a case-by-case basis, and we give deference to the factfindings of the sentencing judge." *United States v. Ramirez*, 426 F.3d 1344, 1356 (11th Cir. 2005) (per curiam). Additionally, comment four of U.S.S.G. § 3B1.1 explains that "[t]here can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." U.S.S.G. § 3B1.1 cmt. n.4.

The facts presented at trial supported the district court's finding that Horn was an organizer or leader. As for factor two, role in the offense, Horn set up and maintained at least one call center, and he paid the rent for it and for three other call centers, where sales people cold-called investors and sold Sunset shares. Horn further recruited several sales people and paid them their commissions, satisfying the third factor, recruitment of accomplices. Horn also claimed the right to a larger share of the fruits of

the crime, the fourth factor, since he received nearly a quarter of the proceeds of each sale. As for the degree of participation in planning or organizing the offense, the fifth factor, Horn oversaw the call centers, followed up on sales calls by emailing and calling the victims and sending them instructions on where to wire money, and -- unlike co-defendant Plummer or the other sales people who reported to him -- Horn reported directly to the Watsons. Finally, as for the nature and scope of the illegal activity, the sixth factor, Horn participated in an extensive years-long scheme to fraudulently sell millions of dollars of worthless stock shares to many investors.

Horn may not have been at the very top of the food chain in this conspiracy, but the facts support that he knew the overall scheme, hired and directed many accomplices, operated the call centers, directed where the money would be wired, and dispersed funds. On these facts, we can discern no clear error in the district court's determination that Horn's offense level should be enhanced. *See, e.g.*, *United States v. Rendon*, 354 F.3d 1320, 1332 (11th Cir. 2003) (upholding a four-level enhancement where a defendant operated a drug smuggling boat, hired at least two participants, knew the delivery location of the drugs, and gave instructions to throw cocaine overboard when a Navy plane flew overhead).

Horn's arguments are unpersuasive. For one thing, the role played by Horn went far beyond being a glorified administrative assistant, as he put it. He also claims that he was not an "organizer" or "leader" at Sunset because he was not on the Board or a

corporate officer at the company.  But even setting aside the fact that comment four of the Guidelines instructs us that titles are not determinative, *see* U.S.S.G. § 3B1.1 cmt. n.4, Horn has confused the structure of Sunset with the structure of the conspiracy.  Although others held Board or officer positions at Sunset, they were not a part of the conspiracy, and they were kept in the dark.  In sharp contrast, Horn was clearly inside the conspiracy, despite having no official title in Sunset.  Horn further says that he recruited no one, but he cites only to the testimony of an FBI agent on cross examination saying he cannot recall whether Horn recruited anyone, not that Horn actually did not recruit anyone.  Finally, Horn generally realleges that he was an innocent victim duped by the Watsons, which is just a dispute with the jury verdict.

We turn next to Horn's argument, which does not cite to any authority, that the district court erred in finding that he was a "broker" or "dealer," and accordingly in giving him a four-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(20)(A).  This too is a factual finding at sentence that we review only for clear error. *United States v. McGuinness*, 451 F.3d 1302, 1304 (11th Cir. 2006) (per curiam).

The district court did not clearly err because the evidence establishes that Horn qualifies for this enhancement.  Section 2B1.1(b)(20)(A) of the Guidelines provides a four-level enhancement where an offense involves:

a violation of securities law and, at the time of the offense, the defendant was (i) an officer or a director

of a publicly traded company; (ii) a registered broker
or dealer, or a person associated with a broker or
dealer; or (iii) an investment adviser, or a person asso-
ciated with an investment adviser.

U.S.S.G. § 2B1.1(b)(20)(A). The application notes clarify that a
"registered broker or dealer" means the same thing as the defini-
tion found in 15 U.S.C. § 78c(a)(48). U.S.S.G. § 2B1.1 cmt. 16. That
statute covers any "broker or dealer registered or required to reg-
ister pursuant to" 15 U.S.C. §§ 78o or 78o-4, which generally covers
anyone engaged in interstate securities transactions. *See* 15 U.S.C.
§ 78o. Since Horn was engaged in securities transactions, he was
required to register and therefore qualified for the § 2B1.1(b)(20)(A)
enhancement.

   Horn's arguments are unavailing. Horn reiterates that he
does not qualify for the enhancement because he was an innocent
administrative assistant. But this is unsupported by the record and
contrary to the jury verdict. Horn also argues that it is not clear
from the record which role under § 2B1.1(b)(20)(A) -- officer, direc-
tor, broker, or investment advisor -- he falls under, and asks this
Court to remand the case "for a resentencing hearing to clarify"
"*which* of the 4 titles the court found to apply the enhancement."
This too is unconvincing. Horn cites no authority for the proposi-
tion that the district court was required to make a specific finding
about which of the four titles applies for the enhancement. In any
event, the Government explained in its reply to Horn's objections
to the Presentence Investigation Report ("PSI") that he met the def-
inition of "broker or dealer" and reiterated those arguments at

sentencing, where the Government represented (without objection) that Horn was conceding the point and where the court subsequently overruled the objections to the PSI. The record is thus clear that the district court understood that Horn qualified for the enhancement as a broker or dealer, and the district court did not clearly err.

We also find no merit in Horn's claim, again citing to no legal authority, that the district court erred by making a two-level enhancement for "10 or more victims" pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i). The number of victims is a factual question at sentencing that we review only for clear error. *United States v. Rodriguez*, 732 F.3d 1299, 1305 (11th Cir. 2013). "Although review for clear error is deferential, a finding of fact must be supported by substantial evidence." *Id.* (quoting *Robertson*, 493 F.3d at 1330). Where the defendant objects to the number of victims, the government has a duty to present "reliable and specific evidence." *Id.*

Here, the Government fully met its burden. The Government offered two dozen pages of Sunset's internal records cataloguing the private placement of stocks, including to whom they were sold, the buyers' contact information, the price at which the stocks were sold, and other related information. The Government also presented a table with the names of dozens of known investor-victims, which also included the dates of purchases and total loss for each victim, with citations to trial exhibits, including wire transfer records, bank records, and Sunset's own records. This showing of specific and reliable evidence is far more than "an allegation by

the government on a piece of paper," *Rodriguez*, 732 F.3d at 1305, that the offense involved more than ten victims.  The district court did not clearly err.

### B.

Horn next challenges the district court's loss calculation at sentencing.  Horn's arguments are unpersuasive.

For starters, we are unconvinced by Horn's argument that the district court erred at sentencing when it used "intended loss" for sentencing purposes rather than "actual loss."  As a preliminary matter, as of November 1, 2024, U.S.S.G. § 2B1.1(b)(1)(A) defines "[l]oss" as "the greater of actual loss or intended loss."  *See* U.S.S.G. § 2B1.1(b)(1)(A) (2024); U.S.S.G. App'x C Supp. Amend. 827.  At the time of Horn's sentencing on September 22, 2022, the definition of "loss" was in the commentary to Section 2B1.1 and not in the text. *See* U.S.S.G. § 2B1.1(b)(1)(A) cmt. n.3 (2021).

Horn's reasoning goes this way.  Under *Stinson v. United States*, 508 U.S. 36 (1993), the Supreme Court held that the Sentencing Commission's comments to the Sentencing Guidelines Manual are "akin to an agency's interpretation of its own legislative rules," and, consequently, the comments must be given "controlling weight unless [they are] plainly erroneous" or "inconsistent with the [Guidelines]."  *Id.* at 45.  However, in *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), the Supreme Court revisited this deference and determined that an agency receives deference "only if a regulation is genuinely ambiguous" after courts have first "exhaust[ed] all the 'traditional tools' of construction."    *Id.* at 2414–15 (citation

omitted). *Kisor* did not explicitly overrule *Stinson*, and *Kisor* did not concern the Sentencing Guidelines.

Then, in *United States v. Dupree*, 57 F.4th 1269 (11th Cir. 2023) (en banc), this Court was tasked with "figur[ing] out how to read *Stinson* and *Kisor* together," and concluded that "the only way to harmonize the two cases is to conclude that *Kisor*'s gloss on *Auer* and *Seminole Rock* applies to *Stinson*." *Id.* at 1275. Following *Dupree*, we defer to the Sentencing Commission's Commentary to the Guidelines only if the Guideline is genuinely ambiguous. *Id.* Accordingly, Horn argues that we should never reach the Commentary to Section 2B1.1. This is because U.S.S.G. § 2B1.1(b)(1) instructs that the offense level should be increased by the amount of the "Loss (Apply the Greatest)," and the term "loss" is unambiguous, meaning "actual loss." As a result, Horn adds, even though Application Note 3(A) to Section 2B1.1, which is part of the Commentary, says that, subject to some exclusions not relevant here, "loss is the greater of actual loss or intended loss," we never have to reach the comment.

The Government responds that Horn failed to raise his *Kisor*/*Dupree* argument in district court, so we can review it only for plain error. If the government is right, then this case is controlled by *United States v. Verdeza*, 69 F.4th 780 (11th Cir. 2023). In *Verdeza*, the defendant argued for the first time on appeal that § 2B1.1's use of the word "loss" is unambiguous, so the Court considered the question under the plain-error review standard. *Id.* at 794. We noted that "[a]n error cannot be plain unless the issue has been

specifically and directly resolved by . . . on point precedent from the Supreme Court or this Court." *Id.* (quoting *United States v. Sanchez*, 940 F.3d 526, 537 (11th Cir. 2019)). "But whatever else *Dupree* did, it did not 'specifically and directly resolve[]' the question of whether § 2B1.1's definition of 'loss' is ambiguous." *Id.* We previously had held that "loss" includes "intended loss" under § 2B1.1(b)(1). *Id.* at 793–94; *accord United States v. Orton*, 73 F.3d 331, 333 (11th Cir. 1996). Accordingly, under the plain-error standard of review, the *Verdeza* Court was bound by *Orton* and held that the district court did not err in using the greater of intended or actual loss. *Verdeza*, 69 F.4th at 794.

But Horn argues that he preserved the issue in the district court, so we are obliged to review the question *de novo*. Horn raised this issue twice in his formal objections to the PSI. First, he objected that "[t]he *actual* number of 68 investors and *actual* sale of 1,985,164 shares more accurately reflects the 'loss[,'] than the *intended* loss of $3,750,000." Second, he objected to the PSI's statement that "*intended* loss amount is $3,750,000 18 level increase" and replied, "*Actual* loss amount attributable to Horn is $182,027 (amount he received) 10 level increase." Horn's counsel elaborated on these written objections at sentencing.

At no point before the district court did Horn bring up *Kisor*, *Dupree*, or whether the Guidelines were ambiguous, and he made almost no legal argument as to why the court should use actual rather than intended loss. Rather, Horn argued about the nature and extent of the loss that was actually foreseeable to him.

Nevertheless, Horn was adamant throughout that he thought "[t]he *actual* number . . . more accurately reflects the 'loss[,'] than the *intended* loss."

Precedent is clear that while an issue can be waived, alternative arguments on an issue cannot. *See, e.g.*, *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992) ("Once a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below."). By way of example, in *In re Home Depot Inc.*, 931 F.3d 1065 (11th Cir. 2019), Home Depot argued in district court that the court should not apply a multiplier to class counsel's lodestar for one reason, then argued a completely different reason on appeal. *Id.* at 1086. Although we observed that the "new argument is based on a different line of precedents . . . and is inconsistent with the old argument," we held that Home Depot was presenting only "a new argument, not a new issue," since "Home Depot asked the District Court not to apply a multiplier." *Id.* We acknowledged that "[i]t's a close call," but because Home Depot on appeal was making "the same request, albeit for different (and contradictory) reasons," "[t]he issue was not waived." *Id.*

Horn clearly and repeatedly asked the district court to use actual loss instead of intended loss. Now, Horn raises the same issue, although for reasons relying on a different line of precedent. Like the defendant in *Home Depot*, Horn raises "a new argument, not a new issue," and did not waive the issue. *Id.* Thus, the basic

question of whether Section 2B1.1 is ambiguous is squarely before this Court.

Moreover, even if Horn had raised this argument for the first time on appeal, "[t]he question of whether to hear a claim not raised in the district court is ultimately one that falls within the sound discretion of the Court." *Blue Martini Kendall, LLC v. Miami Dade Cnty.*, 816 F.3d 1343, 1349 (11th Cir. 2016); *see also Singleton v. Wulff*, 428 U.S. 106, 121 (1976). On occasion, we have exercised our discretion when an unpreserved issue "presents significant questions of general impact or of great public concern." *Dean Witter Reynolds, Inc. v. Fernandez*, 741 F.2d 355, 360–61 (11th Cir. 1984). The proper reading of the term "loss" potentially affects the sentences of numerous defendants with cases before this Court, in addition to Horn's sentence; it is a significant question having a general impact, so we may properly exercise our discretion.

Turning to the merits, then, and as a preliminary matter, we observe that other circuits have considered whether the term "loss" is ambiguous and whether to defer to the Commentary in the Guidelines to discern its meaning. *See, e.g., United States v. You*, 74 F.4th 378, 397–98 (6th Cir. 2023) (holding that the term "loss" is "genuinely ambiguous" and deferring to the Sentencing Commission's interpretation in the Commentary); *United States v. Boler*, 115 F.4th 316, 328–29 (4th Cir. 2024) (same). *But see United States v. Banks*, 55 F.4th 246, 258 (3d Cir. 2022) (holding that the ordinary meaning of "loss" controls and not deferring to the Commentary). We need not, however, determine whether we are bound by the

Commentary, because we are satisfied that the text of the Guidelines is clear.

We begin with the text of the Guidelines at the time of Horn's sentencing. *See Ross v. Blake*, 578 U.S. 632, 638 (2016); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 69 (2012) ("Interpreters should not be required to divine arcane nuances or to discover hidden meanings."). Section 2B1.1(b)(1) says: "If the loss exceeded $6,500, increase the offense level as follows." U.S.S.G. § 2B1.1(b)(1). The Guidelines then include a chart, one of the columns of which is headed by the words, "Loss (Apply the Greatest)." *Id.* Section 2B1.1 does not define the word "loss," so we presume that the term carries its ordinary meaning. *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1214 (11th Cir. 2008). Merriam-Webster Dictionary defines "loss," among other things, as "a person or thing or an amount that is lost." *Loss*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/loss (last visited Jan. 31, 2025). Black's Law Dictionary, similarly, defines "loss" as:

> An undesirable outcome of a risk; the disappearance or diminution of value, usu. in an unexpected or relatively unpredictable way. When the loss is a decrease in value, the usual method of calculating the loss is to ascertain the amount by which a thing's original cost exceeds its later selling price.

*Loss*, Black's Law Dictionary (12th ed. 2024).

Although neither definition references intended loss, *Kisor* and *Dupree* instruct that we should not determine that the Guidelines are ambiguous until we have "exhaust[ed] all the 'traditional tools' of construction." *Dupree*, 57 F.4th at 1275 (quoting *Kisor*, 139 S. Ct. at 2415). And although we start with the ordinary meaning of a word, it is also a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132–33 (2000)); *see United States v. Shannon*, 631 F.3d 1187, 1189 (11th Cir. 2011) (noting that "our interpretation of the Sentencing Guidelines is governed by traditional rules of statutory construction"). The text of the Guidelines, then, must be construed as a whole, since "[c]ontext is a primary determinant of meaning." Scalia & Garner, *Reading Law: The Interpretation of Legal Texts*, *supra*, at 167.

Here, U.S.S.G. § 1B1.3 -- which is an introductory guideline providing definitions for relevant conduct throughout the Guidelines -- provides that courts "shall," for the purposes of calculations in Chapter Two, unless "otherwise specified," calculate harm as including "all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, *and all harm that was the object of such acts and omissions*." U.S.S.G. § 1B1.3(a)(3) (emphasis added). Of course, the use of the term "shall" means "must." There is nothing precatory about this verb form. *See Schwier v. Cox*, 340 F.3d 1284, 1292 (11th Cir. 2003). Moreover, this definition uses the conjunctive "and," which means that courts must consider not

only "all harm that resulted" from the defendant's conduct, but also "all harm that was the *object* of" his conduct. *Id.* (emphasis added); *see United States v. Palomar-Santiago*, 141 S. Ct. 1615, 1620–21 (2021).

Merriam-Webster, in turn, defines "object" as "the goal or end of an effort or activity: purpose, objective." *Object*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/object (last visited Jan. 31, 2025). It also lists "intention" and "intent" as synonyms for "object." *Id.* Similarly, Oxford English Dictionary defines "object" as "goal, purpose, or aim." *Object*, Oxford English Dictionary, https://www.oed.com/dictionary/object_n (last visited Jan. 31, 2025). Applying these dictionary definitions, Section 1B1.3(a)(3) instructs us that courts must consider as relevant conduct not only the harm caused by the defendant that actually occurred, but also the harm that was the goal or object of the defendant's conduct -- that is, the harm the defendant intended to cause. *Cf. Voisine v. United States*, 579 U.S. 686, 691–92 (2016) (noting that committing an assault intentionally requires that a defendant "have that result as a 'conscious object'" (citation omitted)).

In the context of financial crimes, like fraud and other crimes covered by U.S.S.G § 2B1.1, the relevant "harm" contemplated by Section 1B1.3(a)(3) is "loss." Because courts must consider both actual harm and intended harm to calculate harm under Section 1B1.3(a)(3), this means that for purposes of calculating "loss" under Section 2B1.1, courts must consider both "actual loss" and

"intended loss."  And Section 2B1.1(b)(1) says to use "Loss (Apply the Greatest)."  In other words, we see no need to turn to the Application Notes in the Commentary to the Guidelines to know that a court should apply the greater of actual loss or intended loss.  The text of the Guidelines and the traditional tools of statutory interpretation unambiguously tell us so.  Therefore, the district court correctly used intended loss for sentencing purposes rather than limiting its analysis to actual loss.

What's more, Amendment 827 -- the amendment to U.S.S.G. § 2B1.1(b)(1) that moves from the Commentary to the text of the Guidelines a definition of "loss" as "the greater of actual loss or intended loss" -- applies.  Amendment 827 was effective as of November 1, 2024, which is after Horn's sentencing date of September 22, 2022.  When an amendment takes effect during the pendency of a direct appeal, it applies if it is a "clarifying" amendment rather than a "substantive" amendment.  *United States v. Presendieu*, 880 F.3d 1228, 1245 (11th Cir. 2018).  To determine whether an amendment to the Guidelines is substantive or clarifying, we consider the following factors:

> First, we look to whether the amendment alters the text of the Guideline or alters only the commentary. An amendment that alters the text of the Guideline itself suggests a substantive change, while an amendment that alters only the commentary suggests a clarification. . . . Second, this Court looks to whether the Commission has described an amendment as clarifying or whether its statements in the amendment commentary reflect a substantive change in the

punishment for an offense.  Third, we examine whether the Commission has included the amendment in the list of retroactive amendments in [U.S.S.G. § 1B1.10(d)].  Finally, we have noted that an amendment overturning circuit precedent suggests a substantive change, but that such an amendment could be considered clarifying if it "clarifies a meaning that was inherent in the original Guideline."

*United States v. Jerchower*, 631 F.3d 1181, 1185 (11th Cir. 2011) (citations omitted).

Considering the amendment in light of our case law, we conclude that it is a clarifying amendment.  First, the amendment simply moves longstanding commentary to the text.  Specifically, Amendment 827 moves commentary defining "loss" into the text of the Guideline under a "Notes" section of the text, and we have previously found that moving explanatory commentary to the text of the Guidelines, when it explains the meaning of a pre-existing provision of the Guidelines, constitutes a clarifying change.  *See Presendieu*, 880 F.3d at 1245.

Furthermore, Amendment 827's characterization of the relocated text as "Notes" suggests that it is meant to explain the text of the Guideline, not to alter it.  *See Note*, Merriam-Webster Dictionary,    https://www.merriam-webster.com/dictionary/note (last visited Jan. 31, 2025) (defining "note" as "a brief comment or explanation").  Such an explanatory supplement to the text of the Guidelines further indicates that Amendment 827 is clarifying.  *See Jerchower*, 631 F.3d at 1187.  Indeed, Amendment 827 bears no

resemblance to the kinds of amendments we have previously deemed substantive, such as an amendment that created an entirely new provision in the text of the Guidelines, *see United States v. Handlon*, 97 F.4th 829, 833 (11th Cir. 2024) (per curiam), or one that replaced a one-dimensional enhancement with a graduated framework, *see United States v. Morales-Alonso*, 878 F.3d 1311, 1313 n.2 (11th Cir. 2018).

   In the second place, the Commission's statements and descriptions of the amendment also weigh in favor of characterizing Amendment 827 as clarifying rather than substantive. In its "Reason for Amendment," the Commission described how it adopted Amendment 827 to maintain the status quo. Specifically, the Commission noted that "loss calculations for individuals in the Third Circuit" were being "computed differently than" those in other Circuits, and it communicated that Amendment 827 was aimed at "ensur[ing] consistent loss calculation across circuits." U.S.S.G. App'x C Supp. Amend. 827. This approach, the Commission explained, would "ensure consistent guideline application . . . without taking a position on how loss may be calculated in the future" should the Commission "undertake a comprehensive review of § 2B1.1 in a future amendment cycle." *Id.* In other words, the Commission's statements accompanying Amendment 827 reserve a potential substantive change in the future and demonstrate that the amendment maintains the same longstanding approach for calculating loss used in this Circuit's case precedent. *See, e.g.*, *United States v. Toussaint*, 84 F.3d 1406, 1407–08 (11th Cir. 1996); *United States v. Grant*, 431 F.3d 760, 762, 764–65 (11th Cir. 2005); *United States v. Moran*, 778

F.3d 942, 973–74 (11th Cir. 2015); *United States v. Moss*, 34 F.4th 1176, 1190, 1192 (11th Cir. 2022).

Third, although Amendment 827 is not included in a list of retroactive amendments in § 1B1.10(d), that fact does not weigh heavily here, since § 1B1.10 pertains only to amendments that result in reduced terms of imprisonment, which is not applicable.

Finally, Amendment 827 does not overturn our Circuit's precedent. *See Jerchower*, 631 F.3d at 1187. Rather, it is consistent with the approach we have taken for the last thirty years, under which courts have sentenced defendants while considering both actual loss and intended loss in their Guidelines calculations. *See, e.g.*, *Toussaint*, 84 F.3d at 1407–08; *Grant*, 431 F.3d at 762; *Moran*, 778 F.3d at 973–74; *Moss*, 34 F.4th at 1190.

Thus, the amendment -- which maintains the rule that loss is the greater of actual or intended loss and which is consistent with our longstanding precedent -- applies to Horn. And in our view, this conclusion flows logically from and is altogether consistent with our conclusion that the term "loss" is unambiguous when reading the Guidelines as a whole, *see supra*. Put differently, the Guidelines already unambiguously say that loss is the greater of actual or intended loss, and Amendment 827, a clarifying amendment that applies to Horn, makes that conclusion even clearer.

## C.

There is no basis in Horn's remaining claims that the sentencing court otherwise miscalculated loss. Horn argues that the Government failed to prove by a preponderance of the evidence

factual "but for" causation that the victims actually relied on the fraudulent materials when purchasing Sunset shares. Many of Horn's arguments regarding the intended loss calculation rely on this Court's decision in *United States v. Stein*, 846 F.3d 1135 (11th Cir. 2017), which is distinguishable from this case.

Under *Stein*, "[t]he government bears the burden of proving by a preponderance of the evidence actual loss attributable to the defendant's conduct." *Id.* at 1152. However, the sentencing court is "not generally required to make detailed findings of individualized losses to each victim." *Id.* (quoting *Orton*, 73 F.3d at 335). "Instead, the court may employ a variety of methods to derive a 'reasonable estimate of the loss' to the victims based on the information available to the district court" so long as that estimate is based on "reliable and specific evidence" and not the district court's "speculat[ion] about the existence of facts." *Id.* (first quoting *United States v. Snyder*, 291 F.3d 1291, 1295 (11th Cir. 2002); and then quoting *United States v. Ford*, 784 F.3d 1386, 1396 (11th Cir. 2015)). Because the "sentencing court is in the best position to assess the evidence and estimate the loss based upon that evidence . . . the court's loss determination is entitled to appropriate deference" and will generally be upheld so long as it is "reasonable." *United States v. Gupta*, 463 F.3d 1182, 1200 (11th Cir. 2006) (quoting *United States v. Renick*, 273 F.3d 1009, 1025 (11th Cir. 2001)).

The Government must also show causation: that is, but for the investors' reliance on the fraudulent information, they would not have purchased the stock. *Stein*, 846 F.3d at 1153. The

government may make this showing "either through direct evidence or specific circumstantial evidence." *Id.* In *Stein*, the issue was that the "government failed to satisfy either of these options." *Id.* at 1154. There, the defendant was convicted of mail, wire, and securities fraud based on evidence that he fabricated press releases and purchase orders to inflate the stock price of a publicly traded company. *Id.* at 1139. At sentencing, the district court "found that more than 2,000 investors relied on Mr. Stein's fraudulent information, but the only evidence supporting this finding was the testimony of two individuals that they relied on Mr. Stein's false press releases and generalized evidence that some investors may rely on some public information." *Id.* at 1140. This Court reversed, finding that the government made no showing of direct, individualized evidence for each investor, and that the circumstantial evidence was "far too limited" to "support the inference that *all* 2,415 investors relied on Mr. Stein's fraudulent information when deciding to purchase Signalife stock." *Id.* at 1154.

Horn argues that his case is similar to *Stein* in that in calculating both intended loss for sentencing and actual loss for restitution, the district court improperly extrapolated from the four victims who testified at trial and attributed their reliance to more than a thousand victims who bought Sunset stock.

As a preliminary matter, Horn failed to adequately raise this argument before the district court. The Government filed a detailed restitution memo with the court explaining its actual loss calculations, laying out the *Stein* standard, and explaining how the

Government satisfied it.  Horn never filed a response, and Horn's counsel only loosely touched on this issue at the restitution hearing when he noted that there could have been other investors who made money, and that the Government did not contact all of those people to determine whether each one made or lost money.  But these statements did not clearly present the issue of factual causation to the district court.  *See Gennusa v. Canova*, 748 F.3d 1103, 1116 (11th Cir. 2014) (holding that a "single, passing reference" to an issue "unaccompanied by any discussion or elaboration" does not preserve an argument).  Therefore, we review it only for plain error.

Again, however, there was no error at all.  *Stein* is different from this case because the Government made an adequate showing of specific circumstantial evidence here.  Unlike the facts in *Stein*, which involved a publicly traded company with real publicly available information that had some fraudulent information sprinkled in, *see Stein*, 846 F.3d at 1140–41, 1144–45, Sunset's victims all purchased their shares through private placement.  The private placement sales were made by cold-calling investors and giving them the fraudulent sales pitch, followed up by emails containing the fraudulent PPM and sales presentation.  The only information available to Sunset's investors was the fraudulent information provided directly to them by Horn and his sales team.  This was the argument made by the Government before the district court, and the district court adopted the Government's reasoning at the restitution hearing.

Horn does not seriously contest this circumstantial evidence. He argues instead that at least some of the victims were "sophisticated investors" who were capable of purchasing stock based on their own knowledge and experience without relying on the fraudulent sales materials, because they "were well aware of how to check out Sunset's value of shares in the stock market." But the argument is unpersuasive because Horn's hypothetical investor had no way of checking Sunset's value of shares in the stock market, since there was no publicly available information beyond the fraudulent information coming from Sunset itself. Horn singles out Dr. Pankey, a wealthy oral surgeon who testified as a victim at trial, as an example of a "sophisticated investor." However, Dr. Pankey testified that he tried to look Sunset up, but that his search "didn't turn up too much" except that "it was a company," so he relied on Plummer's[5] representations over a series of phone calls.

In short, the district court did not err, much less plainly err, in finding that the Government proved, by a preponderance of the evidence, "but for" causation through specific circumstantial evidence that the Sunset investors who purchased shares through the private placement relied on the fraudulent materials and representations.

Horn also argues that unforeseeable intervening events destroyed the value of Sunset's shares. Horn failed to raise this

---

[5] In his testimony, Dr. Pankey refers to a series of phone calls with "Alexander Goldstein." The parties stipulated at trial that "Alexander Goldstein" was an alias sometimes used by Plummer.

argument before the district court, so it too is reviewed only for plain error. In any event, the argument is meritless.

Horn again relies on *Stein*. In *Stein*, we also held that the district court erred by "failing to take into account intervening events that may have contributed to investors' losses." *Id.* at 1154, 1156. When calculating loss and restitution, the defendant in *Stein* urged the district court "to consider that Signalife stock value had declined in part because of the short selling of over 22 million shares of Signalife stock and the across-the-board stock market decline of 2008." *Id.* at 1155. The district court did not consider these factors, so we reversed. *Id.* at 1156.

Along the same lines, Horn argues that Sunset stock was similarly affected by four intervening events: (1) the fact that "the vast majority of Sunset shareholders would not go through with the agreed-upon process to get their stocks unrestricted to sell them"; (2) Sunset's acquisition by Aphex in 2020; (3) Aphex filed Completed Satisfactions of two judicial liens that remained on the Sunset balance sheet; and (4) Aphex filed for bankruptcy in May 2022. Horn, however, never explains how these "intervening" events affected the value of Sunset's stock, instead only vaguely suggesting that the district court somehow should have accounted for them.

But how Horn expected the district court to have accounted for these events is not obvious. That Sunset's shareholders could not sell their stock without undergoing an arduous unrestricting process was not an unforeseeable intervening factor, but rather a

known condition of every sale of stock in the private placement. Nor was the stock necessarily wholly devalued by Sunset's acquisition -- for example, Arnold Horn made his profit in 2021, a year after the acquisition -- although the acquisition did trigger Sunset's retroactive acknowledgment that its assets were, in fact, nonexistent the entire time. Horn's remaining intervening events are entirely speculative. Thus, by way of example, Horn poses only hypothetical questions regarding the effects of the satisfaction of judicial liens. If there were any error in the district court's failure to inquire *sua sponte* about this fact -- which does not appear anywhere in this record -- that error was not plain.

More importantly, the impact of intervening events on a stock's "true" value does not need to be accounted for when the stock has no true value at all. Unlike in *Stein*, where the company still had some value as a legitimate company after accounting for the inflation in share price from fraud, and the unrelated decrease in that true value from the 2008 market crash that had to be separated out, Sunset was not a company with any true value. The evidence presented at trial established that Sunset did not even have enough cash flow to pay its officers for years on end, and after being bought out, Sunset retroactively admitted that the value of its assets was "zero."

In similar situations, we've held that the "true" value of a stock is appropriately considered to be zero when calculating loss. In *United States v. Hedges*, 175 F.3d 1312 (11th Cir. 1999), the conspirators "disseminated false information to the public" stating that

the company "operated a large number of cosmetics and women's apparel stores and that these operations were highly profitable," when in reality, the company "operated only a few stores, its business ventures generated almost no revenue, and the company was operating at an enormous loss." *Id.* at 1313. The Court upheld a sentence holding a conspirator liable for a loss calculation that found that the stock was not only "overvalued" but "completely worthless." *Id.* at 1316 & n.11.

The facts of this case are far more analogous to those found in *Hedges* than those in *Stein*, so it is appropriate to calculate loss as the entire amount defrauded from investors, because they received a share in a company that was worthless. Again, the district court did not err, much less plainly err, when it did not inquire *sua sponte* into intervening events that may have affected Sunset's true value.

Horn further claims that the district court failed to make an individualized finding as to what amount of loss was foreseeable to him, since he left Sunset in November 2015 and should not have had any subsequent loss attributed to him. A court may hold a defendant accountable only for those acts jointly undertaken in the conspiracy that were reasonably foreseeable to him. *United States v. Mateos*, 623 F.3d 1350, 1370 (11th Cir. 2010). But, as we've noted, there is no evidence in the record that Horn affirmatively withdrew from the conspiracy as a matter of law as opposed to merely ceasing to participate in it. Thus, the only question is whether the further acts of the conspiracy were reasonably foreseeable to Horn after he ceased participation.

Here, our precedent is clear: where a defendant "was actively involved in contacting and recruiting clients into this fraudulent scheme" and was "actively involved in recruiting investors to further the . . . scheme," he is accountable for the entire loss, even if he "did not necessarily 'design'" the scheme himself. *United States v. McCrimmon*, 362 F.3d 725, 731–33 (11th Cir. 2004) (per curiam). The district court did not err in attributing the entire loss to Horn.

Horn also briefly raises several additional arguments that boil down to his disagreement with the jury verdict and his claim that "Sunset stock had *actual value*." He argues that the "loss amount" should be limited to the four victims who testified at trial because no "outright fraud" was perpetrated by Horn, in so far as investors who bought shares never complained of fraud until the FBI contacted them. But this is contrary to the jury verdict, which found that Horn committed multiple counts of fraud.

Next, Horn says that the actual value of Sunset shares should be deducted from the loss amount because "[i]t's not like Sunset was selling shares in a unicorn farm. Sunset stock had *actual value* . . . ." But Sunset *was* a "unicorn farm," so to speak: every asset about which it boasted -- real estate, various banks and businesses, and rare collections of artifacts and jewels -- were completely fictitious, and we've considered stocks like this to be "worthless" for the purposes of calculating loss. *Hedges*, 175 F.3d at 1316.

Horn also argues that almost none of the investors ever tried to go through the process to unrestrict or sell their Sunset stock. But Horn fails to make an argument: he asks only a rhetorical

question ("Should these stocks be considered a loss attributable to Horn?").  "We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority."  *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014).  Finally, Horn argues that loss was not foreseeable to him because he was "duped" and "deceived," but this too is contrary to the jury's verdict.

### D.

Horn also disputes the district court's calculation of his restitution, though his arguments are mostly redundant with his objections to the district court's calculation of loss.  As for his arguments that the Government failed to prove "but for" causation, that the Sunset stock actually had value, and the value should be subtracted from the restitution calculation, we've already rejected these claims.  The district court did not plainly err in finding that the government proved, by a preponderance of the evidence, "but for causation" and that Sunset's stocks are worthless.

Finally, Horn's claim that the district court erred because it did not credit any profits toward the total loss similarly fails.  For example, Horn's father made a profit of $30,000 on his shares.  The Government excluded him from the total loss, just as it deducted any amounts recouped by investors through the sales of their shares.  Horn, however, wants us to go further and subtract his father's $30,000 profit from the total loss amount calculation.  Horn cites no legal authority to support this calculation method and we

are aware of none.  Horn generally cites to *Stein*, but *Stein* mentions the "buyer's only" method only twice in the factual background section and does not reach the calculation dispute at all because in *Stein*, the court disposed of the case on causation grounds.  *Stein*, 846 F.3d at 1144–45, 1154.

★ ★ ★

For all of these reasons, we affirm the determinations made by the district court and its judgment.

**AFFIRMED.**

22-13327                 JORDAN, J., Concurring                 1

JORDAN, Circuit Judge, Concurring in Part and Concurring in the Judgment:

I concur in the court's opinion as to all but Part III.B, which addresses Mr. Horn's challenge to the district court's use of intended loss under U.S.S.G. § 2B1.1(b)(1) (2021). As to Part III.B, I concur in the judgment for the reasons set out below.

Our colleague, Judge Newsom, has written that "issuing alternative holdings is often just a bad idea," *United States v. Files*, 63 F.4th 920, 933 (11th Cir. 2023) (Newsom and Tjoflat, J.J., concurring), and I generally agree with him. In Part III.B, I think the court provides unnecessary alternative holdings on procedural and substantive issues.

On the procedural side, the court holds in the alternative that even if Mr. Horn's argument on intended loss—based on cases like *United States v. Dupree*, 57 F.4th 1269 (11th Cir. 2023) (en banc)—was not raised in the district court, we can exercise our discretion to address it as a significant question of general impact or great public concern. From my perspective, this alternative holding is unwarranted. As the court explains, and holds, the *Dupree*-based argument is properly before us because our precedent teaches that parties can forfeit (or waive) issues but not arguments on those issues. Mr. Horn challenged the use of intended loss in the district court, and he is allowed to challenge intended loss again on appeal even if his legal argument is now different. That is all the court needs to say on the point.

2                           Jordan, J., Concurring                        22-13327

With respect to the merits, the court rejects Mr. Horn's challenge to the use of intended loss for two independent reasons. First, the court holds that the term "loss" in the 2021 version of § 2B1.1(b)(1) is not ambiguous and includes intended loss by virtue of § 1B1.3(a)(3), which states (emphasis mine) that courts "shall," unless "otherwise specified," calculate harm as including "all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and *all harm that was the object of such acts and omissions.*" Second, the court holds that Amendment 827—which in 2024 moved intended loss from the commentary to the text of § 2B1.1(b)(1)—constitutes a clarifying amendment that applies to Mr. Horn's case.

I agree with the latter holding and would not opine on whether the 2021 version of § 2B1.1(b)(1) is ambiguous as to the use of intended loss. Our sister circuits are divided on that question, *compare United States v. You*, 74 F.4th 378, 397–98 (6th Cir. 2023), *with United States v. Banks*, 55 F.4th 246, 258 (3d Cir. 2022), and the Fourth Circuit has concluded that § 2B1.1(b)(1) is ambiguous even after consulting § 1B1.3(a)(3). *See United States v. Boler*, 115 F.4th 316, 325–26 (4th Cir. 2024) ("We agree with the Government's view that the context of [§] 1B1.3 applies to our interpretation of 'loss' as written in [§] 2B1.1. . . . Indeed, [§] 1B1.3 lends more ambiguity to the meaning of 'loss' because it can encompass more than the actual harm caused by a defendant."). This is a "good opportunity for us to practice judicial minimalism, and decide no more than what is necessary to resolve [this] . . . appeal." *Harbourside Place, LLC v. Town of Jupiter*, 958 F.3d 1308, 1322 (11th Cir. 2020).